U–HAUL INTERNATIONAL, INC. d/b/a U–Haul and U–Haul Co. of Texas, Inc. d/b/a U–Haul of Dallas, and East Fork Enterprises, Inc. d/b/a Jot 'em Down, Inc., Appellants,

v.

Talmadge WALDRIP, Bernice Waldrip, Dinah Simington, and Anne Waldrip–Boyd, Appellees.

No. 05–08–01172–CV.

Court of Appeals of Texas, Dallas.

Aug. 31, 2010.

---

Christopher J. Pruitt, Brown Pruitt Peterson & Wambsganns, David E. Keltner, Kelly Hart & Hallman, LLP, Fort Worth, TX, Sandra G. Rodriguez, Thomas S. Leatherbury, Vinson & Elkins, L.L.P., Dallas, TX, for Appellants.

Ted B. Lyon, Jr., Ted B. Lyon, & Associates, P.C., Mesquite, TX, Charles W. McGarry, Law Office of Charles McGarry, Dallas, TX, for Appellees.

Before Justices MORRIS, FITZGERALD, and FRANCIS.

## OPINION

Opinion By Justice FRANCIS.

Talmadge Waldrip suffered catastrophic injuries when a rented U–Haul truck he was exiting began to roll backward, knocked him to the ground, and rolled over him. Experts agreed the truck had an inoperable parking brake and damaged transmission, although they disagreed about the extent and cause. After hearing three weeks of testimony, a jury found U–

Haul International, Inc. (UHI) and U–Haul Co. of Texas, Inc. d/b/a U–Haul Co. of Dallas (UHT) negligent and grossly negligent and East Texas Fork Enterprises, Inc. d/b/a Jot 'Em Down (JED) negligent and awarded more than $84 million in compensatory and exemplary damages. The trial court reduced the exemplary damage award under chapter 41 of the Texas Civil Practice and Remedies Code and rendered a $45 million judgment.

The U–Haul defendants appealed separately from JED. All raise issues related to the legal and factual sufficiency of the evidence to support the liability and damage findings, admission and exclusion of certain evidence, and charge error. After reviewing the record, we conclude there was not clear and convincing evidence to support a gross negligence finding against UHI and reverse the $11.1 million punitive damage award against UHI. We affirm the trial court's judgment in all other respects.

UHI is a Phoenix, Arizona-based equipment rental company that began operating in 1945. UHI has forty-nine subsidiaries operating throughout the United States and Canada. These subsidiaries, one of which is UHT, own and operate rental centers and oversee the operations of independent dealers renting U–Haul trucks to consumers. At the time of trial, there were more than 15,450 rental locations renting a fleet of more than 100,000 trucks. Of these, some 1,450 locations were company-owned centers staffed by U–Haul personnel while 14,000 were independent dealers authorized to rent trucks by contract. JED is an antique store that operates as an authorized independent dealer of U–Haul equipment.

On September 20, 2006, Waldrip's daughter, Annabeth Boyd,[1] rented a U–Haul jumbo hauler (JH 6097) from JED to move some of her belongings to a warehouse in Forney, Texas.[2] The truck, a 1988 International jumbo hauler with a five-speed standard transmission, had logged more than 233,000 miles. Because Annabeth did not know how to operate a standard transmission vehicle, she asked her father to drive.

After Annabeth loaded the truck with her belongings, Waldrip drove it the seven miles to Forney without problem. He pulled up next to the warehouse, which was on a slope, turned off the ignition, put the truck into first gear, and set the parking brake. As he began stepping out, the truck began to roll and the open door hit him in the back. Waldrip tried to get back into the truck to stop the rolling, but he was knocked to the ground. The 26–foot, 12,000–pound truck rolled over Waldrip, crushing his mid-section, and dragged him down the slope about sixty feet. When Annabeth arrived at the scene about five minutes later, she found her father lying beside the truck with his head pointed to the rear. The truck was parallel to the building.

Waldrip was taken from the scene by helicopter and was hospitalized for eight months with massive, life-threatening injuries. After the scene was cleared, Matthew Nichols moved the U–Haul truck next to the warehouse. Nichols had difficulty putting the truck in gear and said the

---

1. Annabeth Boyd is the name used at trial to identify Waldrip's daughter, although she is listed in the pleadings and judgment as Anne Waldrip–Boyd. For purposes of this opinion, we will refer to her as Annabeth.

2. Waldrip founded JED in 1969 and transferred his interest in the company to his daughter Annabeth and her then-husband, Larry Boyd, in 1996. At the time of the accident, the Boyds had mediated a divorce settlement. Neither Waldrip nor Annabeth owned any interest in JED at the time of trial.

truck rolled with the parking brake engaged. Two days later, a mechanic inspected the truck for the Waldrip family and found the parking brake was inoperable. Later inspections revealed damage to the transmission.

Waldrip, his wife, and two daughters sued appellants for negligence and gross negligence, alleging the circumstances leading up to the accident were the result of a systemic pattern of "mismanagement and poor inspection, conflicting inspection policies and/or practices, negligent fleet replacement patterns, maintenance, repair practices and woeful incompetence." At trial, the evidence focused on U–Haul's policies with respect to the inspection, maintenance, and repair of its vehicles and how those policies were applied to the truck in this case.

Witnesses testified UHI developed and controlled the policies for inspection, repair, and maintenance of the vehicles while UHT was responsible for actually implementing the UHI policy for trucks in Texas, including the JH 6097. The system relied on mileage- and time-based inspections as well as customer feedback. First, UHI required a Preventive Maintenance inspection every 5,000 miles (PM–5). Among other items, a PM–5 inspector was supposed to functionally and visually inspect the parking brake system, check the transmission fluid level, and check for any signs of leakage. If the truck passed, a second inspector would drive the truck and, among other things, check the parking brake. U–Haul witnesses testified that if a road test was not done, the inspection was not considered complete.

Because some trucks were driven less miles than others and consequently would be subject to fewer PM inspections, UHI also required that all trucks periodically undergo a less-involved safety certification inspection. UHI had designated JH 6097 as a rotation, or in-town, truck. Rotation trucks were generally older and had higher mileage. The frequency of safety certification inspections on rotation trucks was in dispute. Some U–Haul documents required rotation trucks be safety-certified every thirty days. Other company documents, however, suggested the thirty-day requirement applied only to rotation trucks at company-owned centers while rotation trucks assigned to independent dealers were to be safety-certified every sixty to ninety days.

Area field managers, employed by U–Haul companies, performed the safety certifications on equipment at independent dealers. The inspection included the same functional test of the parking brake required in the PM–5 inspection. The inspection also required the field manager to check the transmission fluid in automatic transmission trucks, but no such inspection was required on standard transmission vehicles. In addition to the safety certification inspection, U–Haul required a federal Department of Transportation (DOT) inspection annually. U–Haul witnesses testified that a PM–5 inspection covered all items required by the DOT inspection.

Finally, in between the mileage- and time-based inspections, U–Haul relied on customer feedback by way of a receipt and dispatch tag (R & D). When a customer returned a truck either to a center or independent dealer, the U–Haul agent was supposed to ask whether the customer had any braking, engine, or electrical problems and then record that information on the tag. The tag also required the agent to note whether a PM inspection or safety certification inspection was needed. Finally, before every rental, the agent was supposed to check (1) the lights, (2) for leaks, (3) fluid levels, and (4) tire pressure and tread, and also was to (5) clean the windshield and cab box and record so on the tag. No check of the parking brake was

required. The agent was to sign the tag, certifying the truck was customer ready.

If any safety issues arose during the inspections or the R & D process that could not be repaired on-site, U–Haul policy required that the truck be grounded and the information entered into the computer system in the Downed Equipment Tracker until repairs were completed. UHI maintained the computer database.

Evidence related to the JH 6097 showed that in the previous eleven years, it had been serviced in shops across the United States and at two locations in Canada. The repair history was extensive, leading one expert to question why the truck was still in service. The truck was on its third transmission, and the rear transmission seal had been replaced three times since 2001. Additionally, the entire parking brake system had been replaced, but had continued to have problems. Just one year earlier, in September 2005, the truck had been grounded and placed in the company's computer system after a report was made that the parking brake light switch stayed on and the parking brake did not work. Although evidence showed the switch was repaired, no evidence indicated that any work, other than an "adjust and lube," was done on the parking brake itself.

The following month, the truck underwent its last PM–5 inspection in Florida. During the first phase of the PM–5, the truck passed both the parking brake and transmission reviews. Questions arose about the second phase or the road test, however. U–Haul records related to that test did not correspond to the truck's mileage, raising questions as to whether the correct truck was road-tested, although U–Haul explained that the wrong mileage was entered.

Ignacio Reveles was the first customer to rent and drive the truck after the October 2005 PM–5 inspection. Reveles, who had experience driving large trucks, drove the truck from Florida to Texas and testified he had problems from the beginning starting the truck and shifting the gears. On the first night of the rental, he parked the truck outside his home in Florida, put it in gear, set the parking brake, and locked it. When he went outside the next day, Reveles said the truck had rolled about four feet and was stopped by a concrete parking block. Because of these problems, Reveles said that during the drive from Florida to Texas, he always left the truck running and bought wood blocks that he placed at the front and back tires to prevent it from moving. Reveles said he reported these problems to the Florida U–Haul agent, who told him to call the 1–800 number.

When he returned the truck at the Dallas U–Haul center on Ferguson Road, he again reported the problems. Reveles said he told the U–Haul worker the parking brake did not work, he had a problem shifting gears, and the truck leaked and made a "noise." When he was leaving the center, he said he saw the truck rolling backward across the parking lot, even though he had set the parking brake, put it in gear, and turned off the engine. Reveles said he watched as a U–Haul worker chased the truck down and was able to stop it. The R & D tag, however, shows the U–Haul worker checked "okay" to questions asked of Reveles about the truck.

The truck remained at Dallas-area locations for the next several months and was safety-certified three times—in November 2005 and January and March 2006, the latter two times by Jason Crews, an area field manager. Crews was hired by UHT executive Lynn Buck, who testified she knew Crews had no mechanical experience when she hired him. Buck explained that mechanical experience was not a qualifica-

tion she looked for because the person would be doing only "minor maintenance checks" and U–Haul provided the resources "for us to learn the rest if need be."

Crews's area included JED, where UHT transferred the truck on June 26, 2006. During the first week of July, Crews safety-certified the truck during a visit to the dealership. During his visits to the independent dealers, Crews said he worked on the equipment, serviced the dealer and the lot, and did "everything that pertained to the training and so forth of that dealership." In the months before the accident, Crews said he oversaw twenty-six to thirty-four dealerships with up to twenty trucks and up to twenty trailers at each dealership.

Crews acknowledged he had no prior experience in maintaining, inspecting, or repairing 12,000–pound trucks before U–Haul hired him, but said he underwent two or three weeks of training on the "entire spectrum" of field manager duties, which included spending one day in the shop. Although he said he had no independent recollection of the JH 6097, he said he would not have applied a new safety certification sticker on the vehicle if the parking brake had not passed the functional test. He did not check the truck's transmission fluid, and even testified at trial that such a check would have been "impossible" because the "[t]here's not a way to check the fluid on it." Crews explained the transmission did not have "transmission fluid in it" because it was a "sealed unit." After looking at a similar transmission in the courtroom, however, Crews acknowledged that the fluid could be checked, but only if he crawled underneath the vehicle to do so.

Additionally, Crews testified that for the truck to pass inspection, it needed to have up-to-date PM and DOT stickers. If a DOT sticker was not up-to-date, Crews said he was trained to see when the last PM was performed. As long as the PM inspection had occurred within the past year, he considered the vehicle in DOT compliance. As for safety certifications, Crews said he was trained to perform them every ninety days at independent dealers, although he acknowledged that the dealer manual required safety certifications every thirty days for rotation trucks. Although his practice was to complete a safety circle certification list and input the information into the computer for each safety certification he performed, U–Haul's records did not contain either the certification list or the Dealer Service Report for the truck's July 2006 inspection nor was there a computer record of it.

On July 8, Derrick Bradley was the first customer to rent the truck after Crews had safety-certified it. Bradley testified he had some difficulty getting the truck from second to third gear while driving it on the highway. JED was closed when he returned the truck, so he parked the truck in front of the entrance gate, set the parking brake, and put the truck either in neutral or in gear. Before he stepped out of the truck, he said it rolled about "a good foot" and rested on the gate. The next day, he said he called JED and told the worker the truck rolled into the gate but did not report that the parking brake did not work. The JED worker told him not to worry about it.

Over the next two-and-a-half months, three other customers who rented the truck from JED had problems with the parking brake and/or the transmission. On August 17, Clay Vestal rented the truck from JED to move to a new home. Vestal said "just getting it in gear was kind of iffy." Once he got on the service road and was going 45 to 50 mph, the truck "started shaking pretty good." Vestal said he started using the service brake,

but the pedal was "spongy." So, he said he slowed down and stayed on the service road instead of getting on the highway.

Once he arrived at his new home, Vestal said he pulled the truck nose-first at a slant into his driveway, which was on a "pretty steep" incline. He put the truck into second gear, set the parking brake, and turned off the engine. After he got out of the truck, it rolled down the driveway and across the alley. The truck stopped after its tires left the concrete alleyway onto dirt and hit a big tree limb. Vestal said he was "very surprised."

Vestal then drove to his old house and loaded the truck. When he returned to his new home, he backed the truck in to unload it. Vestal said he made sure the truck was in gear and set the parking brake, pulling on the lever "really hard." As he was stepping out of the truck, it began to roll again, and Vestal said he sat down and pressed the service brake. Consequently, on subsequent trips, Vestal said he ended up parking in the front of the house.

When he returned the truck, he said it took at least thirty minutes for the worker to fill out the paperwork and he was "ready to get out of there" because his family was waiting on him. Vestal said he did not report the parking brake problem because he "figured they knew about it" because it was "an old, beat up truck."

Steve Marco, who had experience driving large, standard transmission trucks, rented the truck on September 1. Marco nicknamed the truck the "Titanic" said it "had been neglected in maintenance." Marco said the steering was "sloppy," the mirror kept "turning in," and when he shifted from one gear to the other, it "didn't feel like the transmission was always going fully into gear" and was going to "pop out." Marco said there was no tension to the parking brake lever, which indicated to him that the brake was not working properly, so he took "extra precautions" to make sure it did not roll. When he parked the truck, Marco said he turned the wheels, so that if the truck rolled, it would hit the curb. Also, he said that before he shut off the engine, he put it into first gear and slowly let out the clutch to feel "full resistance." When he returned the truck to JED, he reported the problems to the agent, although the R & D tag did not reflect his concerns.

Jonathan Simington, Waldrip's grandson, also had experience driving manual transmission trucks like the JH 6097. On September 9, he helped his grandfather move antiques to his new store in Forney. They were using two trucks, one of which was the JH 6097. Simington said after loading the truck, he drove it to Forney and backed it onto the ramp. After he put the truck into first gear, set the parking brake, and turned off the ignition, the truck rolled down the building ramp. Simington said he was able to stop the truck before it hit anything. After that, Simington said he backed the truck all the way into the building, but had one of the workers put a block on the rear wheel to ensure it would not roll.

Simington drove the truck eight times between Sunnyvale and Forney that day and, after the first incident, blocked the wheels when the truck was parked. During one of those trips, the transmission jumped out of gear while he was driving. Simington returned the truck to JED at the end of the day and told his uncle, Larry Boyd, there was "something wrong" with the parking brake. Simington said Boyd was ten to fifteen feet away with his back him, and he was not certain if Boyd heard him. No one asked him if he had any problems with the truck.

Two days after Waldrip's accident and again months later, Randy Reed inspected the truck's parking brake system and

transmission. Reed, a mechanic with more than twenty-three years' experience, said he found damage in both. Reed testified the parking brake drum, brake shoes, and drive shaft were coated in oil, and the brake shoes were worn down below the friction into the metal backing plates. Reed said he had inspected hundreds of parking brake systems on similar trucks and had seen "a lot of damaged components," but he had never seen "one of this factor, not with that kind of grease on it."

Further inspection showed that half of the transmission's six-quart capacity had leaked though the rear transmission seal. The seal had numerous indentations all around its circumference, leading Reed to conclude it had been installed with an improper tool, destroying its integrity and causing it to leak. According to Reed, the fluid leaked onto the parking brake assembly, accelerating the wear of the shoes and causing them to separate from the metal backing plates. Reed testified a correctly maintained and adjusted parking brake locks the drive shaft so the truck will hold when the brake is engaged. If oil or any petroleum product gets on the brake shoes, he said the shoes must be replaced and cannot be simply cleaned. Here, he said, the failure of the parking brake was a direct result of the condition of the brake shoes and drum.

Reed believed, after considering the testimony of witnesses regarding the parking brake failures and the timing of when the failures occurred, the parking brake was not functioning by some time in 2005 and, more particularly, was not working in October 2005 after the final PM–5 inspection or after the final safety certification in July 2006. Reed said U–Haul records showed only a twelve-minute adjustment during the last PM–5 inspection in October 2005, and, after that date, no inspection, repair, or maintenance of the parking brake took place.

With respect to the transmission, Reed testified the low level of transmission fluid caused damage to the first and reverse gears. Reed said the damage created a false gear that could deceive drivers into believing the truck was in first gear when it was not. Reed explained that the transmission, if fully engaged in a gear, would hold a truck in place, regardless of whether the parking brake was engaged. Consequently, if a driver was able to actually get the truck into gear, it would hold in place, regardless of whether the parking brake worked. However, if the driver thought he put the truck in gear, but it was actually in the "fake out gear," the gear would not hold the truck. Reed believed the rear seal had been leaking "for a while" given the "amount of residual [fluid] on the transmission."

Finally, Reed rejected U–Haul's theory that the transmission seal leak was caused by someone driving with the parking brake engaged, explaining at length how the physical evidence did not fit that theory because there was no overheating of the necessary components. If the truck had been properly maintained and inspected, Reed said the condition of both the brake and transmission could have been detected. Reed said he had reviewed some 3,500 U–Haul documents regarding the truck's rental, maintenance, and repair, and based on those records and his own personal observations, he did not believe the inspections on the truck were done correctly, "if any at all," and said maintenance of the truck was "for lack of better terms not—not there."

Dr. Kurt Marshek, a professional engineer with a doctorate degree in mechanical engineering, also criticized U–Haul's policies and practices regarding the safety of its vehicles. Marshek testified he reviewed thousands of documents in connection with this case, including U–Haul

policies and procedures regarding maintenance, inspection, and repair of its vehicles and the JH 6097 in particular.

Marshek discussed one particular U–Haul repair/maintenance policy bulletin, which was still in effect at trial and was signed by U–Haul's founder, L.S. Shoen. The bulletin, which replaced a December 1982 policy, warned about over-repairing vehicles and embraced the concept of the "one-hoss shay." In the bulletin, Shoen explains that "[w]e want good repair, no perfect repair" and says "in repairing a vehicle or a machine, we try to repair parts so that the part will last as long as all other parts and the whole will fail at one time." Attached to the bulletin was a poem written by Oliver Wendall Holmes about the "one-hoss shay."

Marshek, who was familiar with the concept, said it had been applied for designing mechanical equipment so that it "all fails at once." But, Marshek said, it is problematic to apply the theory to a safety device, such as a parking brake. Marshek explained that it makes no sense to attempt to repair a compromised brake system so that it fails when everything else on the truck fails. In fact, Marshek said, "it probably doesn't even make sense to have the truck on the road anymore with 225,-000 miles on it or 228,000 miles, especially if it's having all sorts of mechanical problems, which this particular truck was having."

Marshek said his review of U–Haul documents showed that a DOT inspection was required annually, and the last DOT inspection on the JH 6097 was in May 2005. Marshek said the truck was due for a new inspection in May 2006, but one was not done. He also testified the mileage-based PM–5 inspection, performed in October 2005, did not relieve U–Haul of its duty to perform the federal inspection because the latter is a time-based inspection. Marshek explained "sometimes people don't use

trucks that often in a year, and so it just makes sure that that truck is inspected even though it may not be used that much." Given the various witnesses' testimony that the parking brake failed after the last PM–5 inspection, Marshek told the jury that if a proper DOT inspection been done prior to September 2006, the failure of the parking brake would have been detected. He further opined that the failure to perform that inspection was a proximate cause of the accident.

Further, Marshek testified that based on his review of U–Haul documents and the testimony of James Guinn, a former U–Haul center general manager, safety certifications were required on rotation trucks every thirty days, but the JH 6097 was not safety-certified every thirty days. Marshek opined that, based upon reasonable mechanical probability, if U–Haul had performed the safety certifications every thirty days in at least the three months leading up to the accident, the failure of the parking brake would have been detected. Marshek also stated that the last safety certification in July 2006 was not properly performed, given that the first renter after the inspection, Derrick Bradley, said the truck rolled when the parking brake was applied. Finally, Marshek testified the truck had an extensive repair history, which increased in 1998 as the truck got older with higher mileage. He testified at length regarding the repairs, especially those related to the transmission and parking brake system.

U–Haul's experts who examined the truck agreed the parking brake was inoperable and the transmission damaged at the time of the accident, but they disagreed on the cause and the extent. Thomas Green, a consultant in vehicle accident reconstruction, cause, and analysis as well as vehicle systems analysis, examined the truck's transmission. Green, who holds a

doctorate in mechanical engineering, testified he observed damage to the reverse gear teeth, but he said all other gears "looked to be in good shape" and saw no abnormal signs of wear. He believed the damage was caused by one or more drivers trying to shift into reverse while the vehicle was moving forward. While the damage could cause problems shifting into reverse, he said it would not cause problems shifting into first gear. Further, he said, he did not see an "absence of lubrication" that "would cause any problem."

Green agreed that grease coated the parking brake and came from a leak in the rear transmission seal. He said the leak could have been caused by dirt or debris getting into the seal, improper installation of the seal, or heat generated by driving with the parking brake engaged. He did not believe the seal was improperly installed, although he agreed an improper tool may have been used, leaving heat or debris as the likely causes of the leak. Green said the lip was not cut and the seal appeared to be properly seated around its circumference. Because the fluid drained from the transmission contained metal, he believed the seal began leaking after July 2005, when the truck's transmission fluid was drained and changed. He acknowledged the leak could have been discovered by either looking at it or checking the fluid level. Finally, he concluded the transmission had been properly maintained, explaining the gears were not abnormally worn and were lubricated and that U–Haul records showed the transmission fluid was changed and checked when it was supposed to be.

Ken Sorenson, a professional engineer with a doctorate in mechanical engineering, inspected the truck's parking brake system and found it contaminated with oil and debris and the brake shoes worn down to the metal plate. He concluded the truck had been driven with the parking brake applied, which wore down the brake shoes. Sorenson said he conducted independent testing using a similar truck with moderately and completely worn brake shoes. Sorenson said the parking brake was adjusted so the truck would not move when in second gear. He then drove the truck in first gear with the parking brake engaged and, after driving between one and six miles, he said the parking brake handle fell into the disengaged position. He said that finding was significant because a person could be driving with the parking brake engaged and not know it. Finally, he said he also inspected the transmission, and like Green, saw that the spline teeth on the reverse gear were deformed. Other than that damage, he said the rest of the gear teeth looked "okay."

U–Haul also presented three witnesses who rented the truck during the relevant time period and said they had no problem with either the gears or parking brake. Pablo Casanova drove the truck in late September 2005 and said the truck was in perfect condition. He parked the truck overnight on an incline, did not put it in gear but set the parking brake. He said the truck did not move.

Bree Adams rented the truck from JED in July 2006 and said she did not have any transmission problems. Further, she said truck did not move when the parking brake was engaged, although she acknowledged she parked on a generally flat surface and consequently would not expect the truck to roll. Similarly, Jeff Everett testified he rented the truck from JED in August 2006. He parked on both flat and inclined surfaces, put the truck in gear, and set the parking brake. The truck did not move. However, Everett said he did not know if the gears or parking brake held the truck. He also acknowledged he had "no idea" if the parking brake was working because he did not test it.

Over objection, appellees presented evidence about investigations of U–Haul's safety practices in Canada. Brian Patterson was president of the Ontario Safety League, the oldest public safety advocacy group in Canada. As president, he said he regularly worked with the Royal Canadian Mounted Police, the Ministry of Transportation, and the Ontario Provincial Police.

In 2005 and 2006, Patterson testified the OSL reviewed the routine practices regarding the safety of U–Haul trucks that came into Canada from the United States. Patterson told the jury he personally observed the inspection of about thirty U–Haul vehicles by licensed mechanics, and the evidence he reviewed "indicated a systemic disregard for public safety in the maintenance of vehicles in the Province of Ontario." More than fifty percent, he said, had brake problems, adding that he recalled three specific vehicles with inoperable parking brakes. Other problems included leaking brake lines, leaking transmission fluid, broken power steering hoses, bald tires, faulty suspension, broken brake drums, faulty shocks, and rotted truck floors that could present carbon monoxide poisoning issues.

As a result of the initial investigation, other Canadian governmental investigations of U–Haul, and as part of those investigations, Patterson said about 1400 vehicles were inspected. Brake issues were studied separately in British Columbia, and Patterson testified fifty percent of the trucks tested had faulty brakes and "would not have been allowed on the road."

Patterson had no documentary evidence to substantiate his testimony. Patterson explained that the inspection reports were retained by the garage, and the garage was now "out of business." Additionally, photographs taken at the time of the inspections were in the possession of the Toronto Star newspaper, which along with a Canadian television station, published "exposes" on U–Haul.

Finally, Patterson said he dealt directly with top U–Haul officials in Canada, one of whom was Claude Bouchet. According to Patterson, Bouchet told him that "particularly in 2005 he had absolute difficulty getting any action from ... U–Haul International, and in fact, he had no real say over being able to correct the problems that [had] been identified in Canada." Ultimately, Patterson said Bouchet told him he had spent more than $25 million to repair the fleet-related problems and "scrapped" a number of vehicles that failed to meet the Ontario standard.

Joe Shoen is chairman of the board of UHI and is the son of the company's founder. He testified that UHI owned a fleet of 100,000 trucks that were rented throughout the United States and Canada. Of these, more than 4,500 were standard transmission jumbo haulers with more than 200,000 miles, like the JH 6097. Shoen said he was not concerned about the number of higher-mileage trucks still on the roads and then explained the various features of the truck, such as the wider ramp, lower floor, air-ride suspension, and "excellent fuel econony." He said the truck was popular among customers and described it as a "very unique and wonderful tool" for moving and as "arguably the best truck that's ever been offered for rent in North America to accomplish that objective." Further, he explained that the truck's service life when built was 300,000 miles. He said the truck had a tremendous amount of "utility value for the company," and as long as it was maintained, he believed it was "a very good solution for the customer."

According to Shoen, UHI created an inspection maintenance system for its trucks that allowed every participant in the system to stop the rental of a truck.

According to Shoen, the system operates on the presumption that the truck "doesn't rent" until someone in the system makes a "positive move." The process begins with the R & D tag, which is used on each rental and requires the agent to go through eight steps before allowing the truck to rent. The next level is the periodic safety certification inspections. Shoen explained that U–Haul stores rent three times more frequently than independent dealers; consequently, equipment at the dealers is inspected three times less frequently although Shoen said it "ends up being about the same interval based on numbers of customers through the vehicle." The third level of UHI's program is the preventive maintenance inspections, which are mileage based. Additionally, although the company is not subject to federal regulations, Shoen said it voluntarily performs annual Department of Transportation (DOT) inspections on its trucks.

A fundamental part of the inspection/maintenance program is having U–Haul employees sign off on their work, which Shoen believed gave credibility to what the employee represented was done. For example, he believed Crews properly performed all safety certifications on the truck in the months before the accident because Crews signed off on the inspections, saying "if [Crews] certified that it worked, then it worked." If the parking brake did not work the next day when the truck was rented to the first customer, he said "something happened in the intervening time and most likely someone drove the truck with the parking brake on."

Shoen testified UHI's system is "as good or better" than his "truck rental peers." He believed that, on a scale of one to ten with ten being the best, "U–Haul is rated a 10 in safety." He agreed that a truck with an inoperable parking brake would not be "a 10" and would, in fact, be a "material shortcoming" of the truck. He also said that an inoperative brake would be the fault of "[e]verybody probably involved in the U–Haul system . . . from myself down through and including the people at the actual rental location." He disputed any suggestion it was somehow to U–Haul's advantage to delay and not perform maintenance, explaining if there is a lack of maintenance, it could have "worse financial consequences than the cost of the maintenance . . ."

He acknowledged U–Haul's system relies, in part, on the subjective complaints of a customer who may not have mechanical knowledge. Nevertheless, he did not believe it would be better to perform a "simple mechanical check" on the parking brake and transmission before renting the truck.

Shoen said he was familiar with the criticisms of U–Haul's safety practices by Canadian officials and described them as "everything from a bald tire or a frayed brake line, to registration not on the vehicle." However, he focused on what he termed an "entire class" of complaints regarding the location of the safety decals, saying the vehicles would be marked "out of service" because officials had to open the door of the vehicle to see the DOT sticker and "they're very tidy with their paperwork in Canada." As a result, he said, the location of the sticker was moved on every truck in the system. With respect to the Province of Ontario, Shoen testified that from January 26, 2006 to January 25, 2008, only about seven percent of U–Haul's trucks were removed from service for either driver or vehicle issues. Shoen explained that Canadian officials could ground a truck for any number of reasons independent of U–Haul, such as if a driver failed to wear eyeglasses.

At the conclusion of the evidence, the jury found the negligence of UHI, UHT, and JED proximately caused the occur-

rence and apportioned liability at 50, 49, and 1 percent, respectively. The jury also found (1) JED was negligent while acting in the furtherance of a mission for the benefit for UHT and subject to UHT's control as to the details of the mission; UHT was negligent while acting in furtherance of a mission for the benefit of UHI and subject to the control by UHI as to the details of the mission; and (3) UHI authorized UHT to delegate JED all or part of UHT's responsibility to further the mission of UHI or ratified the delegation of responsibilities. The jury also found UHI and UHT were grossly negligent.

The jury awarded Waldrip actual damages as follows: (1) $1 million past and $1.5 million future physical pain and mental anguish; (2) $170,000 past and $935,000 future loss of earning capacity; (3) $2.5 million past and $500,000 future disfigurement; $2.5 million past and $5 million future physical impairment; and $1.4 million past and $3 million future medical expenses. In addition, it awarded loss of consortium damages to his wife and two daughters. The jury awarded Waldrip exemplary damages of $42 million against UHI and $21 million against UHT.

After considering the parties' post-judgment motions and responses, the trial court reduced the exemplary damages to $11,760,000 against UHI and UHT each, and rendered a $45,689,248.63 judgment, plus pre- and post-judgment interest. This appeal ensued.

## I. Negligence

In the U–Haul appellants' third issue and JED's first issue, they contend the evidence is legally and factually insufficient to support the jury's negligence findings against them.

In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reason-able jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). Anything more than a "scintilla of evidence" is legally sufficient to support the jury's finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996). To be more than a scintilla, the evidence must rise "to a level that would enable reasonable and fair-minded people to differ in their conclusions." *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

In reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the finding and will set aside the verdict only if the evidence supporting the jury finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Ramsey v. Davis*, 261 S.W.3d 811, 815 (Tex.App.-Dallas 2008, pet. denied). In making this review this Court is not a fact finder, and we will not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 392 (Tex.App.-Dallas 2000, pet. denied).

██ To prevail on their negligence claim, appellees had to establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). To establish breach of duty, the plaintiff must show the defendant did something an ordinarily prudent person exercising ordinary care would not have done under those circumstances, or the defendant failed to do that which an ordinary prudent person would have done in the exercise of ordinary care. *Lincoln Prop. Co. v. DeShazo*, 4 S.W.3d 55, 61 (Tex.App.-Fort Worth 1999, pet. denied)

(op. on reh'g); *Gannett Outdoor Co. of Tex. v. Kubeczka,* 710 S.W.2d 79, 87 (Tex. App.-Houston [14th Dist.] 1986, no writ). To prove the defendant failed to use "ordinary care," the plaintiff must show the defendant did not exercise that degree of care a person of ordinary prudence would have used under the same circumstances. *Gannett Outdoor Co.,* 710 S.W.2d at 87.

Appellants do not dispute the failed parking brake was the proximate cause of the accident that resulted in Waldrip's injuries, nor do they challenge on appeal appellees' evidence that the damage to the parking brake system was caused when U–Haul mechanics improperly installed a rear transmission seal, destroying its integrity and allowing it to leak transmission fluid onto the brake shoes. Evidence at trial established the truck presented a danger if it was rented without an operating parking brake and a truck like the JH 6097 should not be rented without an operating parking brake. Even UHI's chairman of the board Joe Shoen testified that an inoperative parking brake was a "material shortcoming" that would be the fault of "[e]verybody probably involved in the U–Haul system … from myself down through and including the people at the actual rental location."

Appellees further presented expert testimony that the condition of the parking brake and transmission suggested the problems had existed for a long time, at least since 2005. It was not disputed at trial that once a petroleum product gets on the brake shoes, ordinary care required the shoes be replaced and not simply cleaned. Finally, the jury heard evidence, disputed by appellants, that customers had reported a failed parking brake for months, yet some of the complaints were not recorded on the R & D tags and the brake was never repaired. With this in mind, we consider whether appellants acted with ordinary care. We begin with UHI.

### 1. UHI

■ UHI asserts no evidence shows it knew or should have known of any parking brake or transmission problem or that the truck had been rented prior to being repaired. The evidence established UHI controlled and designed the system for repairs and maintenance of its fleet of 100,000 trucks which traveled across the United States and Canada. UHI was the entity that maintained and managed the records of repairs and maintenance by way of a computer database. All information of repairs and maintenance were entered in the database. If a safety issue arose during inspections or was reported by a customer, UHI policy required the truck be grounded until repairs were made and the information entered into the system in the Downed Equipment Tracker. Thomas Coffee, UHI's director of repair, analysis, and support, maintained the database.

In September 2005, the JH 6097 was grounded in Florida after a customer reported the "PARKING BRAKE LIGHT STAYS ON" and "NO PARKING BRAKE." This information, including the report of no parking brake, was recorded in UHI's computer database in the Downed Equipment Tracker, as shown in Plaintiff's Exhibits 4 and 114, the DET tracker history of this truck.[3] A mobile repair unit was dispatched the next day to make the necessary repairs to the parking brake switch and the parking brake; however, when the MRU unit arrived, the truck had been rented and was not at the location. Repair records show that two weeks later, an MRU repaired the parking brake switch at a Florida rental location.

---

**3.** In its brief, UHI asserts the database contained only "a notation of a malfunctioning parking brake light," which was repaired. As indicated above, the record shows otherwise.

Although the MRU made other repairs to the truck, the records do not show any repairs were made to the parking brake itself.

Two weeks after the switch was replaced, the truck underwent and passed a PM–5 inspection. Records show that during this inspection, twelve minutes were spent on an "adjust and lube" to the parking brake. Appellees' expert mechanic Reed, who inspected the truck shortly after the accident, testified that twelve minutes would not be long enough to visually inspect the parking brake. Moreover, Reed testified that if oil gets on the parking brake shoes, ordinary care required that the shoes be replaced; they could not be cleaned. An inspection of this truck after the accident revealed the parking brake drum, brake shoes, and drive shaft were coated in transmission oil that Reed said leaked from a rear transmission seal improperly installed by U–Haul workers in 2003. Reed said the seal had been leaking "for a while" given the amount of fluid in the transmission. Moreover, the road test portion of this inspection raised questions about whether the inspection was complete or proper because the mileage for the truck road-tested did not correspond to the JH 6097.

Regardless, the following the day, the truck was rented to Reveles, who drove it from Florida to Texas. In a videotaped deposition and a statement admitted into evidence, Reveles, an experienced heavy-duty truck driver, testified he immediately had problems with the truck's performance. In particular, he said the truck would not start, the parking brake did not work, and he had trouble shifting gears. Reveles reported these problems to the Florida U–Haul agent who rented the truck. The agent told him to contact UHI's 1–800 customer hotline. Although Reveles did not say whether he made the call, other evidence showed he did, including the call record for the truck. That record showed only a report of a dead battery; however, appellees' expert Marshek testified on cross-examination, without objection, that Reveles called the 1–800 number to complain about the truck's condition, including the inoperable parking brake.

UHI asserts it should not be held accountable legally "for not knowing, piecing together, and understanding the import of every piece of data maintained in an extensive database...." We cannot agree. The evidence showed UHI's fleet of trucks were rented throughout the United States and Canada. This truck, in particular, had spent the previous year in Florida and, before that, spent time in other states as well as Canadian provinces. Additionally, the truck had undergone repairs and maintenance in the territories of fifty-four different marketing companies in the United States and Canada in the previous eleven years. UHI was the one entity that maintained and managed those records. Further, the evidence showed UHI was not simply a repository for the information; it analyzed and utilized that information to send various directives to its subsidiaries regarding inspections and maintenance of particular trucks.

UHI also argues even if it knew or should have known about the parking brake problem, the truck "passed several subsequent tests of the parking brake *after* the alleged report and *before* Waldrip's accident almost a year later, negating any possible inference that Coffee or UHI was negligent by allowing the truck to be rented." UHI's argument, however, misses the point. As Reed, the expert mechanic, testified, a parking brake does not repair itself, and the evidence showed no repairs were made to this parking brake after UHI had notice. That minor safety inspections failed to uncover the problem

UHI was already aware of does not relieve UHI of its duty of ordinary care to ensure trucks with inoperable parking brakes are not allowed on the roads.

Further, appellees presented extensive testimony and documentary evidence regarding the inspection, maintenance, and repair records for this truck. The evidence showed the truck was eighteen years old with more than 233,000 miles. The repair history was extensive and, as one expert said, reflected chronic problems with the transmission and parking brake system. That same expert questioned whether the truck should have even been on the road at all, given the truck's history.

Having reviewed the evidence in the light most favorable to the jury verdict, we conclude it is legally sufficient to support the jury's negligence finding against UHI.[4] We note that UHI's issue also purports to challenge factual sufficiency, although no such argument is briefed. Regardless, having reviewed all the evidence and giving deference to the jury's credibility determinations, we conclude it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

## 2. UHT

Next, we consider the evidence with respect to UHT. Reveles testified he returned the truck to the U–Haul center on Ferguson Road in Dallas in October 2005. He parked in the front of the center, set the parking brake, put the truck in gear, and turned off the engine. Reveles testified that he and a friend, Juan Sanchez, went inside, and Reveles reported the parking brake did not work and he had problems shifting gears. Reveles testified he had Sanchez translate his complaints in English to the agent, and Reveles said he understood what was being said. The U–Haul agent's response was to tell him that he owed him for two extra days. As he and Sanchez were leaving the center, Reveles testified he observed the truck rolling backward across the parking lot. Reveles said he watched as a worker in a U–Haul uniform chased the truck down and stop it. Despite Reveles's report, UHT did not ground the truck or repair it; rather, it continued to rent the truck out and, in fact, transferred it to JED to continue to be rented to customers.

■ In response to this evidence, UHT simply argues that Reveles's testimony was not credible because (1) Reveles did not report that the truck rolled with the parking brake engaged and (2) Reveles communicated his complaints through Sanchez and Sanchez did not testify. Neither argument has merit. Even if Reveles did not specifically report that the truck rolled when the parking brake was engaged, he testified he reported the parking brake did not work, and that information was sufficient to put UHT on notice that a safety issue existed. Further, with respect to how the communication was made, Reveles testified he had lived in this country for thirty years, he understood English, and

4. To the extent the U–Haul appellants are asserting that appellees' negligence claims fail as a matter of law for failure to produce expert testimony on whether UHI's safety policies met a minimum standard of care, we disagree. The U–Haul defendants rely on *FFE Transportation Services, Inc. v. Fulgham*, 154 S.W.3d 84 (Tex.2004), but they provide no analysis of its holdings to the facts in this case. In *FFE*, the court determined the alleged negligence was not within the experience of laymen because it involved specialized equipment and techniques unfamiliar to the ordinary person. 154 S.W.3d at 91. Here, there was substantial evidence within the knowledge of laymen to establish UHI's negligence and, with respect to issues requiring expertise, appellees presented expert testimony. And, unlike in *FFE*, the evidence established that each of the defendants had notice of the parking brake problem before Waldrip rented the truck.

he understood the conversation between Sanchez and the U–Haul agent. It was within the jury's province to determine the weight to give this testimony.

UHT also asserts that even if Reveles reported a parking brake problem, such a report would not be "sufficient evidence that UHT was negligent in allowing JED to rent the truck to Ann[e] [Waldrip] nearly a year later" because the truck passed subsequent minor safety inspections. UHT does not otherwise explain or provide legal authority for its position, and we reject any notion that UHT, once it had notice, satisfied its duty to not place the truck on the road until the parking brake was repaired by relying on minor safety certification inspections for which jurors could have believed were also negligently performed.

In particular, the evidence showed that Jason Crews performed three of four of the inspections, including the last one performed before the truck was eventually driven by Waldrip. A UHT executive hired Crews knowing he had no mechanical experience with heavy-duty trucks, and Crews displayed his lack of knowledge with respect to a truck like the JH 6097 during his testimony at trial. Although Crews testified he would not have safety-certified the vehicle if the parking brake had not properly functioned, the evidence showed that paperwork regarding this inspection was missing. Moreover, evidence showed the parking brake failed on the first renter after Crews's final July 2006 safety certification, and several other customers who rented the truck over the next two-and-a-half months gave similar testimony. From this evidence, a reasonable juror could have believed Crews failed to properly perform the inspection. As Reed testified, a parking brake does not repair itself and a proper safety certification inspection would have revealed the parking brake issue. Having reviewed the evidence, we conclude it is legally sufficient to support the jury's negligence finding against UHT. Like UHI, UHT has not briefed its complaint regarding the sufficiency of the evidence. Regardless, having reviewed all of the evidence, we cannot conclude that the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

### 3. JED

■ Evidence showed UHT transferred the truck to JED on June 26, 2006, and Crews safety-certified it during the first week of July. The first person to whom JED rented the truck after Crews' inspection testified the truck did not hold when the parking brake was engaged. Over the next two months, three other customers had problems with the parking brake and/or transmission. One of these customers, Steve Marco, reported a parking brake problem when he returned the truck to JED. Nevertheless, JED did not ground the truck and did not notify UHT of the problem. Instead, JED continued to rent the truck. This evidence is both legally and factually sufficient to support the jury's negligence finding against JED.

Finally, we note another basis for affirming the jury's negligence verdict exists. In three separate questions, the jury was asked (1) was JED negligent while acting in furtherance of a mission for the benefit of UHT and subject to control by UHT as to the details of the mission; (2) was UHT negligent while acting in furtherance of a mission for the benefit of UHI and subject to control by UHI as to the details of the mission; and (3) did UHI authorize UHT to delegate to JED all or part of UHT's responsibility to further the mission of UHI, or did UHI ratify such delegation of responsibilities, if any. The jury answered each question affirmatively.

On appeal, neither UHI nor UHT challenges the legal or factual sufficiency of the evidence to support the findings to these questions. Instead, in a footnote, only UHI argues it is not vicariously liable "since neither UHT nor JED was negligent." Having found the evidence supported the negligence findings against all defendants, we conclude the unchallenged jury questions regarding vicarious liability provide an additional basis to affirm the negligence verdict as to both UHI and UHT. We overrule the U–Haul appellants' third issue and JED's first issue.

## II. Gross Negligence

In their second issue, the U–Haul appellants challenge the legal and factual sufficiency of the jury's gross negligence findings against them. The gross negligence questions for both UHI and UHT were identical. Each asked whether the jury found by clear and convincing evidence that the "occurrence in question resulted from gross negligence attributable to" UHI (Question 10) and UHT (Question 9).

A corporation is liable for punitive damages for gross negligence only if the corporation itself commits gross negligence. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998). Gross negligence consists of both an objective element and subjective element. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). As provided by the charge, appellees had to prove by clear and convincing evidence (1) that, when viewed objectively from the defendant's standpoint at the time of the occurrence, the defendant's act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety,

or welfare of others. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(11) (Vernon 2008).

Under the first or objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Ellender*, 968 S.W.2d at 921. Under the second or subjective component, "actual awareness" means that the defendant knew about the risk, but the defendant's acts or omissions demonstrated that it did not care. *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (1993).

The jury was instructed for UHI or UHT to be grossly negligent, it had to find the person or persons responsible for the act or omission was employed by UHI/UHT in a managerial capacity and was acting in the scope of that managerial capacity; or UHI/UHT authorized the doing and the manner of the act; or an employee of UHI/UHT was unfit and UHI/UHT was reckless in employing him; or (4) UHI/UHT or an employee in a managerial capacity of UHI/UHT ratified or approved the act. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex.1997).

Employed in a "managerial capacity" was defined as (1) a corporate officer of UHI/UHT; (2) a person who had authority to employ, direct, and discharge an employee of UHI/UHT; or (3) a person to whom UHI/UHT has confided the management of the whole or a department or division of the business of UHI/UHT.

In conducting a legal sufficiency review under the "clear and convincing" standard required to sustain a gross negligence finding, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could reasonably form a firm belief or conviction that its finding was true." *Southwestern Bell Tel. Co. v. Garza*, 164

S.W.3d 607, 609 (Tex.2004) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002)).

 In a factual sufficiency review of a finding subject to a clear and convincing standard of proof, we must give due deference to evidence that a fact finder could reasonably have found clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### 1. UHI's gross negligence

Waldrip asserts two bases to affirm the jury's findings that UHI was grossly negligent: (1) Coffee and/or Shoen was personally responsible for grossly negligent acts and omissions and (2) Shoen expressly ratified or approved the negligent acts or omission of UHI or that UHT and/or JED committed while acting for UHI.

 We begin with Coffee, who managed UHI's repair database. The only evidence presented about Coffee was a two-and-a-half page affidavit executed to oppose a discovery request. Other than Coffee's title as director of repair, analysis, and support of UHI and his statement that he has managed the database since 1995, there is no other information regarding Coffee's capacity within UHI. Because appellees did not produce evidence that Coffee was a corporate officer, had authority to employ, direct, and discharge UHI employees, or that he managed a department or division, we cannot conclude there is clear and convincing evidence that he was employed in a managerial capacity. *See Hammerly Oaks*, 958 S.W.2d at 391.

 Shoen, on the other hand, is clearly a corporate officer. But there is no evidence that he had any knowledge, prior to the accident, of any problems with the parking brake and/or transmission of the JH 6097 or of the truck at all, and any suggestion by appellees otherwise is simply unsupported by the record.

Further, Waldrip relies on the "infamous 'one-hoss shay' policy bulletin," which he contends was issued by Shoen. To the contrary, the record established that the policy was issued by Shoen's father, L.S. Shoen, more than twenty years ago, and no evidence showed any current employee was even familiar with the policy, much less that the policy was followed. Regardless, having read the policy, we cannot conclude it is clear and convincing evidence of gross negligence. Waldrip criticizes the policy for advocating "good repair, not perfect repair." But the fact that a policy promotes "good repair, not perfect repair" does not constitute gross negligence; the policy did not encourage, mandate, or otherwise embrace substandard or even negligent repair.

Finally, Waldrip asserts Shoen approved of trucks being rented without safety certifications and approved UHT's failure to do a DOT inspection by claiming the DOT inspections were voluntary. Assuming this evidence is relevant to the gross negligence analysis, it simply would not constitute clear and convincing evidence in this case. At trial, Shoen testified that it "may or may not occur" that trucks are rented with expired safety certifications but did not "have a particular to discuss." For example, he said he would not be shocked if trailers were rented with expired tags, which is part of the safety certification process. Shoen did not testify, and was not asked, if he approved this practice. As for the DOT inspections, Shoen testified U–Haul was not subject to the federal regulations. Whether UHI trucks are subject to federal regulation was contested at trial but has not been adequately briefed by either side in this appeal; con-

sequently, we will not address the issue. But even assuming U–Haul was required by federal law to perform annual DOT inspections on their trucks, Shoen testified UHI policies require such inspections. Moreover, the evidence showed that all DOT inspection items are included in the PM–5 inspection, which is done every 5000 miles.

In sum, considering all of the evidence presented with respect to UHI, we cannot say that a reasonable juror could form a firm belief or conviction that UHI acted grossly negligent with respect to the JH 6097. We therefore sustain UHI's issue. Without a gross negligence finding, there is no basis to support the exemplary damages award against UHI.

### 2. UHT's gross negligence

We reach a different result as to UHT, which argues no evidence shows a vice principal of UHT acted with gross negligence or that UHT recklessly hired an unfit employee.

With respect to the first argument, UHT asserts no evidence established any UHT vice-principal was told of Reveles's report of a parking brake problem. We agree. Reveles testified he reported the problem to an agent at the U–Haul center in Dallas, but he did not identify that person. Further, James Guinn, the center's general manager at the time, stated although such reports were always forwarded to him, no such report was made to him on this truck. We conclude no clear and convincing evidence shows Guinn knew of Reveles's report. To the extent appellees assert Guinn had actual knowledge of the failed parking brake from another source, such as a print-out of a ninety-day repair history for the truck, the exhibit they direct us to does not support their claim. The exhibit is directed to U–Haul repair shops, not rental centers, where Guinn was employed.

Next, we consider whether the evidence supports the jury's gross negligence finding based upon Lynn Buck's hiring of Jason Crews. Buck told the jury she was marketing company president for UHT, and in that position, she managed eight company-owned centers and 130 independent dealers in Texas. Buck said she hired Crews as an area field manager with the responsibility to perform safety certification inspections on equipment at independent dealer locations. When she hired Crews, prior mechanical experience was not a qualification. Instead, she said she "looked for people who had a mechanical inclination who didn't mind working with their hands. Because U–Haul provides the resources for us to learn the rest if need be." When asked if she knew whether Crews had "any mechanical experience whatsoever" before she hired him, she said, "Not that I know of off the top of my head, no." Further, Buck testified Crews did not need any mechanical experience "because we have so many safety hotlines that'll—that we can call that will walk us through it." Finally, she said Crews was not doing mechanical work, only "minor maintenance checks." Buck acknowledged UHT would not be using ordinary care if it rented the truck without a parking brake and with a false gear.

Exhibit 21 is the Safety Circle Certification Checklist in effect at the time Crews inspected the truck at JED. Although most of the more than 100 inspection items are unrelated to the safe mechanical operation of the truck, the inspector was required to perform a functional check of the parking brake and to "[c]heck transmission fluid with engine idling and check for leaks." UHI and UHT relied on the safety certification inspection when touting its safety program at trial. Evidence showed that if a truck traveled less than 5,000 miles in a year, as did this one, the only inspections that would be made would be

the safety certifications every thirty or ninety days, depending on whether the truck was assigned to a company-owned center or assigned to an independent dealer. In other words, the safety certification inspection was the only protection—other than customer feedback—provided by UHT to ensure these trucks, rented to customers, were safe to be on the road.

Crews testified he had no previous mechanical experience with heavy-duty trucks. After he was hired by UHT as an area field manager, he spent two or three weeks with a district certifier "[doing] safety certifications, recruiting new dealers, doing dealer service reports, the entire spectra of being an area field manager." In addition, he said he said one day training in a U–Haul shop. As a field manager, he had responsibility to safety-certify all the equipment in his area. At trial, Crews was questioned at length regarding safety certification inspections and, in particular, about checking the transmission fluid in a standard transmission jumbo hauler. Crews demonstrated his complete lack of knowledge in this area when he testified, wrongly, that there was no way to check standard transmission fluid because "[i]t doesn't have transmission fluid in it. It's a sealed unit." Crews further explained that "[t]here's not a dip stick like a normal transmission" and said "[t]here's no way that I knew of to check transmission levels on a standard transmission." When shown a transmission like that on the JH 6097, Crews conceded that it was possible to check the transmission fluid. That demonstration likely had a profound effect on jurors and their confidence in his fitness to properly perform the required elements of the safety certification inspection.

Finally, we consider the expert evidence regarding the condition of the truck's parking brake system and transmission. Reed, appellees' mechanic, inspected the truck after the accident and found that half of the transmission's six-quart capacity had leaked through a rear transmission seal that had been improperly installed by U–Haul mechanics. The fluid leaked onto the parking brake assembly, coating it in oil and causing the parking brake shoes to separate from the metal backing plate. According to Reed, the failure of the parking brake was a direct result of the condition of the truck's brake shoes and drum.

On appeal, UHT relies on Defendant's Exhibit 24 to support its position that the safety certification checklist required only a check of transmission fluids on automatic transmission trucks. Exhibit 24 is an October 16, 1995 policy bulletin with a safety circle certification checklist attached; the checklist required a check of automatic transmission fluid. However, the 1995 checklist had been updated over the years, most recently in August 2005, as reflected by Defendant's Exhibit 21. The August 2005 checklist does not limit the check on fluid levels to automatic transmission and also includes an added requirement of checking for leaks.

UHT next asserts that there is no evidence that "Crews had actual, subjective awareness of the risk involved in not checking the transmission fluid level but nevertheless chose to proceed in conscious indifference to the safety of those who might rent the truck" or that "UHT *knew* that Jason Crews was unfit in any way." The jury had to first determine whether Crews was *unfit* to check the transmission fluids and for leaks. The jury's affirmative answer is supported by the evidence that showed Crews had no knowledge whatsoever that such a check could be done until it was pointed out at trial. The jury's affirmative answer that UHT was reckless in employing him is supported by Buck's testimony. Buck hired a person with no mechanical experience, and who she believed needed no mechanical experi-

ence, to be directly responsible for checking the transmission fluid level and check for transmission fluid leaks on a heavy-duty truck.

Having reviewed the evidence under the appropriate standards for both legal and factual sufficiency, we conclude the jury could have formed a firm belief or conviction that Crews was unfit and Buck was reckless in hiring him. We affirm the jury's finding of gross negligence against UHT.

### III. Evidentiary Rulings

### A. Canadian Evidence

In the U–Haul appellants' first issue and JED's third issue, they complain the trial court abused its discretion by allowing the testimony of Brian Patterson, who testified about the results of safety investigations conducted on U–Haul vehicles in Canada. Appellants assert the evidence was irrelevant, prejudicial hearsay that tainted the entire trial.[5]

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane,* 239 S.W.3d 231, 234 (Tex.2007) (per curiam). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Id.* An appellate court cannot conclude a trial court abused its

discretion merely because it would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995).

Before addressing the merits of the issue, we note that appellants' brief provides little to no law or analysis on whether the evidence was inadmissible in the first instance. The only objection for which some legal analysis is provided is the relevance complaint; consequently, we will address that complaint but conclude the hearsay and prejudicial objections are inadequately briefed. *See* TEX.R.APP. P. 38.1(i).

Below and on appeal, appellants relied on *Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131 (Tex.2004), to argue Patterson's testimony was irrelevant because appellees failed to show the requisite similarity needed for admissibility. In particular, they assert Patterson did not "say when these inspections occurred, how the trucks were chosen, or whether the vehicles were similar to the one Waldrip drove." Further, they assert most of the problems found during the investigations were unrelated to parking brakes or any other issue in this case. Having reviewed *Nissan* and its holdings, we cannot conclude it mandated exclusion of Patterson's testimony.

*Nissan* is a products liability case in which the plaintiff sued for injuries sustained when her Nissan automobile accelerated out of control and crashed into an office building and then a telephone pole.

---

**5.** Appellees assert appellants waived their complaint because they did not object when the evidence was presented in front of the jury and the trial court did not grant a continuing objection. Appellants objected to Patterson testifying as irrelevant and prejudicial in a hearing outside the presence of the jury. At the conclusion of the hearing, the trial court overruled the objections and stated: "Okay. And let the record reflect that I'm allowing [U–Haul's counsel] to insert these

objections when actually Mr. Patterson is being called as opposed to excusing the jury and having to go through all of these objections again." The trial court then ensured that appellees' counsel understood. Although not a model of clarity, we will construe the trial court's statement as an intent to grant a continuing objection. Consequently, we will consider the complaint preserved for appellate review.

The plaintiff alleged the car had a defective throttle cable which caused the unintended acceleration. As part of her proof, the plaintiff presented evidence of a database of 757 complaints Nissan had received regarding unintended accelerations in the same model vehicle as the one driven by the plaintiff. *Nissan*, 145 S.W.3d at 140–41.

The supreme court reaffirmed its prior holding that the mere occurrence of an unintended acceleration incident is no evidence that a vehicle was defective. *Nissan*, 145 S.W.3d at 137. As for the database of 757 complaints, the supreme court noted that none of the reports attributed the cause to the throttle cable and thus concluded the complaints were "not similar enough" to the defect alleged to be admissible. *Id.* at 141.

■■ Here, the facts are distinguishable. The evidence showed UHI owned the fleet of trucks that were then rented out by company-owned centers and independent dealers across the United States and Canada. All of the centers and dealers, whether in the United States or Canada, were required to follow the same safety policies designed and mandated by UHI. Patterson testified inspections of U–Haul trucks in Canada, conducted before Waldrip's accident, revealed various safety issues. Further, evidence showed that Joe Shoen, UHI's chairman of the board, was made aware of the results of these investigations. The relevance of this evidence did not depend on how the trucks were chosen, whether they were jumbo haulers, or whether the safety concerns involved parking brakes. Rather, this evidence was probative of the broader issue of UHI's knowledge that UHI safety policies regarding its trucks were not being followed, allowing unsafe vehicles to be on the road, and was, at a minimum, admissible on Waldrip's claim for exemplary damages.[6]

■ Even if the trial court's ruling was in error, reversal is warranted only if the error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *Bay Area Healthcare Group*, 239 S.W.3d at 234. To show such harm from an evidentiary ruling, the complaining party must demonstrate that the judgment turns on the particular evidence admitted. *Id.*

Appellants argue the ruling tainted the entire trial because appellees (1) questioned Lynn Buck about it, (2) used the Canadian evidence to "mislead the jury further by fabricating a quote" from Claude Bouchet, a Canadian U–Haul executive, and (3) reminded jurors of the Canadian evidence during closing arguments. Further, they assert the error was "compounded" by the trial court's erroneous exclusion of testimony by Anthony Grocott, U–Haul Canada's president of the marketing company for Western Ontario, who they contend would have testified U–Haul's safety record in Canada was much better than that testified to by Patterson and most of the citations were related to driver issues, not the condition of the vehicles.

■ Having read the record in this case, we cannot agree the judgment "turned on" Patterson's testimony. The evidence was first raised when appellees presented deposition testimony from UHI

---

6. To the extent UHT claims the evidence was irrelevant to any issue with respect to it, UHT does not direct us to, nor did we find, any place in the record where it sought a limiting instruction. When a trial court admits evidence that is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, then the court, if requested, must restrict the evidence to its proper scope and instruct the jury accordingly. *See* Tex.R. Evid. 105(a). If there is no request, the admission of the evidence without limitation affords no ground for complaint on appeal. *Id.*

Chairman of the Board Joe Shoen. Without any objections from appellants, appellees questioned Shoen about Canadian officials criticizing U–Haul maintenance practices. Shoen's testimony suggested the criticisms involved minor issues, stating they involved "everything from [the placement of stickers] to a frayed brake line or a tire with inadequate tread ... [a] defective light or burned out light would be a good example." Shoen explained the Canadian officials "group all these things whether they're paperwork or whether they're mechanical as, quote, safety."

After Shoen's testimony, appellees called Patterson, whose testimony differed from Shoen's as to the results of the safety inspections. Patterson's entire testimony took up only fifty pages of a fifteen-volume reporter's record; of that, only about thirty pages contained some of the objectionable testimony. While we recognize the amount of time spent developing the complained-of evidence is not in and of itself dispositive, it is relevant, particularly in this case where the overwhelming majority of evidence involved the JH 6097 and each defendant's conduct with respect to the truck. In particular, appellees presented substantial evidence that numerous people had rented the truck during the relevant time period and had problems with the parking brake, the transmission, or both. Each defendant, at some point along the way, had notice of these problems, yet none took any action to see that the truck was removed from the road and repaired. We believe, after reviewing the record, that this evidence was most persuasive to the jury, not ancillary evidence about investigations in Canada.

Also, the Canadian evidence was not, as suggested by appellants, a frequent theme throughout the trial. Even on appeal, appellants direct us to only one witness who was asked questions about the Canadian investigation, and she was asked only three questions. Moreover, their assertion that appellees "fabricated" a quote by Bouchet is unsupported by the record; at most, the parties disagreed on the interpretation of Bouchet's statement.

As for their suggestions appellees relied on the Canadian evidence at closing, the record simply belies their claim. In particular, they complain appellees argued: "This is a rotten fleet," and that "U–Haul" was "bad to the bone"; appellees argued for jurors to send Shoen a message on punitive damages: "Stop your games. Stop gambling with people's lives. Stop ruining people's lives. Stop right now. Let Dallas, Texas be the place it stops ... I'll guarantee you, if you speak to him in the language that he understands, if you do what you know that you have the power to do, that will change the policies in this industry ... Don't let millions of people that are out there using their trucks down." Finally, they complain that counsel argued, "These problems are systemic. They don't just happen in one place ... This is a system-wide problem. This is not a problem in one shop."

First, we note that appellants did not object to a single remark that they now claim is proof of harmful error. Second, we have reviewed the entire arguments presented and at no time did appellees mention Patterson or the Canadian studies, nor can we conclude that the complained-of remarks necessarily referred, even implicitly, to the Canadian evidence or that the jury would necessarily have taken it as so.[7]

**7.** For example, the "bad to the bone" argument was in response to U–Haul's argument suggesting that some witnesses' testimony had been influenced by viewing anti-U-Haul websites. Appellees' counsel then argued: "And—and then they get up and they mention—I never mentioned—never did I men-

Appellees were entitled to argue the evidence and any reasonable inferences from it. The jury heard that reports were made on this truck in Florida, as well as Texas, and nothing was done. Further, the jury heard Shoen's own testimony, where he said he was not concerned that a fleet of old trucks, each having logged more than 200,000 miles, remained on the roads essentially because the truck was a customer favorite. And, despite evidence to the contrary, Shoen believed his company rated a ten out of ten in safety, which the jury could have concluded left little room in Shoen's mind for improvement.

■■■ Finally, with respect to Grocott, the trial court excluded him as a witness after ruling that appellants had not disclosed him in discovery. In their brief, appellants do not address the correctness of the trial court's ruling with any legal analysis or citation, other than a general citation to Texas Rule of Civil Procedure 193.6. Consequently, we conclude this complaint is waived. *See* Tex.R.App. P. 33.1. Moreover, even if preserved, Shoen gave precisely the same testimony that appellants assert Grocott would have given. *See Mentis v. Barnard,* 870 S.W.2d 14, 16 (Tex.1994) ("An error in the exclusion of evidence requires reversal if it is both controlling on a material issue and would not be cumulative.") Considering all of the evidence previously outlined in this opinion as well as opening statements and closing arguments, we cannot conclude

the judgment in this case turned on Patterson's testimony.

Next, appellants argue admission of the Canadian evidence violated their due process rights with respect to the award of punitive damages. Appellants explain they are not challenging the excessiveness of the award; rather, they are complaining that their procedural due process rights have been violated.

Given our decision to reverse the punitive damages awarded against UHI, this issue is moot as to that party and we consider the complaint only as it relates to UHT. Although appellants raised a constitutional due process argument in their post-judgment motions, they did not object on constitutional due process grounds at the time Patterson testified. Our rules require a party to complain in a *timely* manner. *See* Tex.R.App. P. 33.1(a). We question whether a post-judgment motion is a timely vehicle for complaining about why certain evidence should be excluded from a jury's consideration.[8] But even if it is, the rules of appellate procedure also require an appellants' brief to "contain a clear and concise argument to the contentions made, with appropriate citations to authorities and to the record." Tex.R.App. P. 38.1(j).

■■■ Here, UHT contends due process (1) "does not permit punitive damages to be awarded for dissimilar acts—here, al-

---

tion a web site. Well, there's a lot of them on this company because they are bad to the bone. They want to mention it because they want error in this case I submit to you."

**8.** Appellants cite us to an unpublished opinion from this Court, *Riedell v. Hoffman Controls Corp.,* No. 05–00–00658–CV, 2001 WL 832342, slip op. at *2, (Tex.App.-Dallas July 25, 2001, no pet.) (not designated for publication), to support their position that a post-judgment motion preserves error. This case has no precedential value. *See* Tex.R.App. P.

47.7. Regardless, it is distinguishable. In *Riedell,* the appellant argued the trial court erred by allowing the plaintiff to recover punitive damages awarded by a jury because the damages were impermissibly based on privileged information. This Court treated the issue as a legal sufficiency complaint, which was preserved. The complaint in this appeal is that the jury considered, in part, inadmissible evidence in determining punitive damages, which we interpret as an evidentiary complaint.

leged violations by U–Haul Canada unrelated to parking brake malfunctions", (2) prohibits a state from imposing punitive damages on a defendant as punishment for conduct that occurred outside the state's borders, and (3) forbids a state from using a punitive damage award to punish a defendant for injuries inflicted on strangers to the litigation. As support, UHT cites to *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *BMW of N. Am. v. Gore,* 517 U.S. 559, 572–73, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); and *Philip Morris USA v. Williams,* 549 U.S. 346, 353–57, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). UHT does not, however, offer any further legal explanation of the constitutional principles upon which it relies. Then, in eight sentences of analysis, it asserts the trial court violated these principles in this case. We cannot conclude that UHT' briefing of this issue meets the minimum standards of adequacy required by our rules and presents nothing for us to review. But even if properly preserved and adequately briefed, we have reviewed the entire record in this case and would conclude that admission of Patterson's testimony did not constitute a due process violation.

The evidence obviously addressed the knowledge of Shoen, as chairman of the board of UHI. At no time did Patterson's testimony mention, refer, or otherwise allude to UHT or any of its officers or employees. Further, all of the evidence with respect to UHT was directly related to its connection to the particular truck in this case. For these reasons, as well as those set out previously with respect to harm, we conclude admission of Patterson's testimony did not violate UHT's due process rights. We overrule all issues related to the admission of Patterson's testimony.

## B. Exclusion of Witnesses

Appellants next argue the trial court reversibly erred in excluding the testimony of Victor Ellis and Brady Shooknanan, two U–Haul mechanics involved in the October 2005 PM–5 inspection of the truck in Florida. The trial court excluded both witnesses after finding they had not been timely disclosed and appellants had not shown good cause or lack of unfair surprise. *See* TEX.R. CIV. P. 193.6(a).

Evidence at trial showed that Ellis performed the first part of the PM–5 inspection on the JH 6097, and documents showed only twelve minutes were spent on the parking brake. Shooknanan was listed on documents as having performed the road test. The documents related to the road test, however, reflected the wrong mileage for the JH 6097, leading to questions as to whether the correct truck was tested.

Parties have an affirmative duty to supplement answers to discovery requests, including identification of individuals with knowledge of relevant facts or individuals designated as trial witnesses. TEX.R. CIV. P. 193.5(a)(1); *see Boothe v. Hausler,* 766 S.W.2d 788, 789 (Tex.1989). An amended or supplemental response must be made reasonably promptly after the party discovers the necessity for such a response. TEX.R. CIV. P. 193.5(b).

■ If a party fails to timely supplement a discovery response, the testimony of the witness is automatically excluded unless the court finds that (1) there was good cause for the failure to timely respond or (2) the failure to timely respond would not unfairly surprise or prejudice the other parties. TEX.R. CIV. P. 193.6(a). The burden of establishing good cause or the lack of unfair surprise or prejudice is on the party seeking to call the witness. TEX.R. CIV. P. 193.6(b). On appeal, the party objecting to the exclusion of the

testimony must show the trial court abused its discretion in making its ruling. *IAC, Ltd. v. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 202 (Tex.App.-Fort Worth 2005, no pet.).

 Although appellants imply that the witnesses were timely designated, they have not presented any legal argument to that effect; consequently, we will address only whether they met their burden of showing good cause or lack of unfair surprise or prejudice. With respect to these exceptions, appellants present the same argument: appellees were aware of the witnesses because their names were in repair records that were previously produced in discovery, and U–Haul and appellants' counsel specifically discussed Ellis and Shooknanan. Having reviewed the record of the hearing, we are not persuaded by appellants' argument.

At the hearing, appellees' counsel explained that several months earlier, he had asked U–Haul's counsel about deposing Ellis, even though he had not been identified, and U–Haul's counsel represented that Ellis had no independent recollection of the truck or PM–5 work order and then sent him an e-mail to that effect. Appellees' counsel said he did not depose Ellis in reliance on this representation. As for Shooknanan, U–Haul's counsel also represented that he had no independent recollection of the truck. We cannot say it was unreasonable for appellees' counsel to decide not to travel to Florida to depose two witnesses who had no independent recollection of relevant facts. Appellees were entitled to rely on appellants' failure to disclose Ellis and Shooknanan as potential trial witnesses and prepare their case accordingly. We conclude the trial court did not abuse its discretion in excluding both witnesses. We overrule the issues.

## IV. Damages

In the U–Haul appellants' fourth issue and JED's second issue, they challenge the jury's damage awards to Waldrip on lost earning capacity, past and future medical expenses, impairment, and disfigurement, and to Waldrip's wife and daughters for loss of consortium. We begin with the damages awarded to Waldrip.

### A. Lost Earning Capacity

Again, in minimal briefing, appellants assert Waldrip failed to produce evidence of his lost earning capacity. Specifically, they assert Waldrip only produced evidence of lost profits, which they contend is not a "legally valid measure of lost earning capacity." Appellants also assert that even if lost profits could support an award for lost earning capacity, it would have to be only *net* profits, and Waldrip's expert testified about *gross* profits. Finally, they assert any lost profit evidence is too speculative.

 Loss or impairment of past, as well as future, earning capacity is recoverable as an element of damages in a personal injury case. *Strauss v. Continental Airlines, Inc.,* 67 S.W.3d 428, 435 (Tex. App.-Houston [14th Dist.] 2002, no pet.). The measure of this type of damage is the plaintiff's diminished earning power or earning capacity in the past or in the future resulting from the injuries he has sustained. *Id.*

 Competent evidence of lost profits may be of probative value in showing lost earning capacity in a personal injury case. *Id.* at 437; *see Dallas Ry. & Terminal Co. v. Guthrie,* 146 Tex. 585, 589, 210 S.W.2d 550, 552 ("[L]oss of profits from a personally operated business may be received in evidence and considered in determining the extent of the injured party's diminished capacity to earn."). How-

ever, lost profits *alone* are not the proper measure of recovery. *Strauss*, 67 S.W.3d at 437. A true measure of earning capacity includes additional factors, such as the character and size of the business, the capital and labor employed, and the extent and nature of the plaintiff's own participation in it for the jury to appraise the value of the plaintiff's personal services. *Id.*

■ The evidence showed that at the time of the accident, Waldrip was preparing to open an antique store. Paul French, a forensic certified public accountant and business evaluator, testified he performed a lost profit analysis for Waldrip's antique business since the accident and had calculated an amount of $169,962. French said his analysis included the cost of products Waldrip had either picked up or had scheduled to pick up; five years of tax returns of JED, utilizing the three most recent years as "most representative"; and product sold under a forced liquidation basis after Waldrip was injured. French, who was familiar with Waldrip's ability to open and operate a viable antique business from previous dealings, testified that based on his experience with Waldrip, his review of his business documents, and having seen his inventory and his previous ability to succeed in "this marketplace," he believed Waldrip had the ability to continue the business if he had not been injured. French acknowledged "ups and downs" in the antique business, but the area was one of the "faster" growing in Texas, and he expected "the need for antiques to grow correspondingly to the need in housing."

In addition to French's testimony, other evidence showed Waldrip had extensive experience in the antique business. He founded JED, an antique store, and ran it for several years before turning over his interest in it to his daughter and then-son-in-law. At the time of the accident, he had been retired but was planning on opening a new store, We're Back Again. He had rented a warehouse for $3,700 a month and had about $210,000 in inventory. Having reviewed the evidence under the appropriate standards, we conclude it is legally and factually sufficient to support the award for lost earning capacity.

### B. Medical Expenses

Next, appellants complain there is no legally and factually sufficient evidence of the awarded medical expenses. They assert although section 41.0105 of the Texas Civil Practice and Remedies Code limits past and future medical expenses to those "actually paid or incurred," evidence at trial included amounts written off by providers. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.0105 (Vernon 2008).

The record reflects the parties agreed to consider the issue of section 41.0105 after the conclusion of the trial. At the post-trial hearing, appellants offered the affidavit of a legal assistant, with accompanying medical records, to prove the amount of the write-offs. The affidavit summarized the amounts of adjustments and write-offs. The trial court sustained objections to the affidavit and excluded the exhibit. On appeal, appellants neither mention the procedure they agreed to nor do they challenge the trial court's ruling. Under these circumstances, we cannot conclude they have shown any error.

■ Additionally, they assert Waldrip failed to present legally or factually sufficient evidence that the reasonable cost of future medical care is $3 million, an amount they contend is $1 million more than projected by Waldrip's expert. Waldrip's life care planner, Alex Willingham, testified that a conservative life care plan, based on twelve to sixteen hours a day of care for an estimated eleven years, would total $2,008,938.77. However, Willingham testified a more liberal plan, providing for

24–hour care, would approach $4 million. The jury awarded an amount that fell within these two figures. The evidence is legally and factually sufficient to support the jury's award.

## C. Physical Impairment and Disfigurement

Appellants next argue the non-economic damages—physical impairment and disfigurement—are grossly excessive and urge this Court to order remittitur.

■ We employ the same standard of review for an excessive damages complaint as for any factual sufficiency of the evidence complaint. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). Consequently, if sufficient probative evidence supports the award, we may not disturb the jury verdict. *See J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 666 (Tex.App.-Fort Worth 1999, pet. denied).

■ We begin with the jury's award for physical impairment. Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle. *Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 412 (Tex.App.-Houston [14th Dist.] 2001, jdgm't vacated). To receive damages for physical impairment, the injured party must prove that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated. *Peter v. Ogden Ground Serv., Inc.*, 915 S.W.2d 648, 650 (Tex.App.-Houston [14th Dist.] 1996, no writ). Examples of injuries or limitations that have been held to be legally sufficient evidence of physical impairment include difficulty eating and communicating with others; continuing inability to sleep due to sharp pains, plus inability to run, bicycle, participate in triathlons, and play with children; past inability to walk and future difficulties in running, standing, and climbing; inability to ascend or descend stairs or kneel and difficulty in standing for long periods of time; loss of seventy-five percent of strength in arm, which subsequently contributed to a plaintiff's falling, breaking a leg, and being confined to a wheelchair; and difficulties performing yard work and car maintenance and playing racquetball. *Patlyek v. Brittain*, 149 S.W.3d 781, 787 (Tex.App.-Austin 2004, pet. denied).

■ Here, the evidence shows that Waldrip can no longer engage in the many activities he was involved in before the accident. Waldrip was active and physically fit. Among other things, he distributed food to underprivileged children, mowed yards, and went to church twice on Sundays. He took his grandchildren to his farm in Arkansas, fished with them, and let them help in the yard. Since the accident, he has been bedridden for twenty hours a day and, in all reasonable probability, will remain so. Twice a day, his wife gets him out of bed, but he cannot sit up for long. He cannot walk. He has not been to church, he cannot go to his farm, and he cannot fish with the grandchildren. He cannot sleep. He has no control of bladder or bowels. His wife brushes his teeth, shaves him, and changes the diaper he must now wear. He receives water through a feeding tube, and urinates through a catheter.

■ In challenging the jury award, appellants do not set out this evidence and analyze it within the context of the jury's finding; rather, they cite two cases, with parentheticals, as comparisons. Because the measure of damages in a personal injury case is not subject to precise mathematical calculation, each case must be measured by its own facts, and considera-

ble latitude and discretion are vested in the jury. *Owens–Corning Fiberglas Corp. v. Martin,* 942 S.W.2d 712, 719 (Tex.App.-Dallas 1997, no pet.). For this reason, a comparison with other cases or amounts of verdicts are generally of little or no help. *Baptist Mem. Hosp. Sys. v. Smith,* 822 S.W.2d 67, 79 (Tex.App.-San Antonio 1991, writ denied). Regardless, other courts of appeal have upheld significant awards for physical impairment. *See Casas v. Paradez,* 267 S.W.3d 170, 189–90 (Tex.App.-San Antonio 2008, pet. denied) (affirming $7 million for 81–year–old man who sustained brain damage in attack at nursing home); *General Motors Corp. v. Burry,* 203 S.W.3d 514, 554–55 (Tex.App.-Fort Worth 2006, pet. denied) (affirming $3.5 million for future physical impairment for mother who suffered brain damage in an accident and could no longer read to her children, drive a car, or live without supervision). We conclude there is ample evidentiary support in the record to support the jury's award for past and future physical impairment.

Next, appellants challenge the $3 million awarded for past and future disfigurement as excessive. They assert that evidence of Waldrip's "scarred legs ..., which are ordinarily concealed by clothing," does not justify the amount.

Disfigurement has been defined as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v. Torres,* 161 Tex. 437, 341 S.W.2d 154, 160 (1960).

 Evidence showed that Waldrip sustained a "degloving injury" to his right hip and buttock extending into the proximal thigh. A "degloving injury" is "like taking the skin and peeling it back from the muscle and underlying tissue." The injury required several skin grafts, and some of the skin for the grafts was taken from his left thigh. In addition, both legs have atrophied. The jury saw some of the injuries first-hand during Waldrip's testimony. Additionally, several photographs that graphically depict his injuries were admitted as evidence. The jury awarded a much lesser amount for future disfigurement, which suggests it believed the skin grafts are helping to reduce Waldrip's disfigurement. Having considered the probative evidence presented, including the photographs, we cannot say the award was excessive.

### D. Loss of Consortium

The jury awarded $1 million in past and $1.6 million in future loss of consortium to Waldrip's wife, Bernice, and $100,000 for past and $60,000 for future loss of consortium to each of his daughters, Annabeth and Dinah. Appellants assert the amounts are excessive.

 Texas law recognizes causes of action for the loss of spousal and parental consortium. *Reagan v. Vaughn,* 804 S.W.2d 463, 466 (Tex.1990); *Whittlesey v. Miller,* 572 S.W.2d 665, 666 (Tex.1978). Spousal consortium "primarily consists of the emotional or intangible elements of the marital relationship." *Whittlesey,* 572 S.W.2d at 666. A spouse may recover for the loss of the injured spouse's affection, solace, comfort, companionship, society, assistance, and sexual relations necessary to a successful marriage. *Id.* at 666. A child may recover for loss of consortium when a parent suffers serious, permanent, and disabling injuries. *Reagan,* 804 S.W.2d at 468. Factors considered in determining the amount of nonpecuniary damages for loss of the parent's love, affection, protection, emotional support, services, companionship, care, and society include "the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the

child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium giving relationships are available to the child." *Id.* at 467. Loss of consortium concerns "subjective states which present some difficulty in translating the loss into a dollar amount." *Whittlesey,* 572 S.W.2d at 667. The loss, however, is a "real one" requiring compensation and must be resolved by the "impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence." *Id.*

■ Again, appellants do not analyze the facts of this case relative to the damages awarded and simply compare the amount to those awarded in another case. The evidence shows Waldrip has suffered severe, permanent, and disabling injuries that have altered the relationships with his wife and children. At the time of trial, Waldrip and Bernice had been married fifty-four years and, according to Dinah, were always close. Before the accident, her father protected her mother and handled all the problems. Both were independent and had their own interests. Now, Bernice is his full-time care-giver. She takes care of Waldrip all day and sleeps on the couch at nights because she "doesn't want to leave his side" in case he needs something. They can no longer travel or go to church together. Jurors were shown a videotape that depicted a typical day for Waldrip and Bernice. Since the accident, Dinah said, "we don't have normal anymore." She said she had seen her mother break down many times. The accident has also been difficult for his daughters, who are both adults. Both daughters are very close to their father. Dinah testified he was her and her sister's "stronghold" and was always available to help them work through questions or problems. Since the accident, she said she cannot go to him and talk because he cannot handle stress. It is difficult for him to hug her, her sister, or mother because it is painful.

The jury, considering this evidence, could have found that the relationships between Waldrip and his wife and children have suffered substantially as a result of the accident. Considering the evidence presented, we cannot say the damages awarded for loss of spousal and parental consortium are excessive.

## V. Charge Error

Appellants argue the trial court abused its discretion in refusing to give the jury a spoliation instruction. They contend appellees "deliberately tampered with critical evidence by repeatedly driving the truck and using a pry bar to 'disassemble' the parking brake assembly" without giving notice to them. Additionally, they assert appellees removed pages from the truck's log book and falsely represented the truck had been returned in the condition it had been in at the time of the accident. Finally, they assert appellees' actions prevented them from conducting testing on the parking brake "in its condition at the time of the accident, testing that may have shown the parking brake was not in fact defective and was not the cause of Waldrip's accident."

■ In their brief, appellants have not directed this Court to any specific instruction they claim was required nor have they quoted the language of a particular requested instruction. Rather, in a footnote, appellants state they requested the filing of a supplemental record that "includes the several requested spoliation instructions." We received the supplemental clerk's record, and it contains four different instructions related to spoliation. Because appellants have not analyzed their issue within the context of any specific instruction, we cannot determine in the first instance if a substantially correct instruction was re-

quested. *See* TEX.R. CIV. P. 278. We over-rule the issue.

We reverse the trial court's judgment awarding Waldrip $11,760,000 in exemplary damages against UHI and render judgment that Waldrip take-nothing on its gross negligence claim against UHI. We affirm the trial court's judgment in all other respects.