

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00461-CV

_____

DARRIEN JAMAL GORDON, Appellant

V.

DAVID REDELSPERGER, Appellee

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-280663-15

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In this civil case, the jury found that Appellant Darrien Jamal Gordon (Defendant) assaulted Appellee David Redelsperger (Plaintiff). The jury awarded Plaintiff certain categories of nonpecuniary damages and denied him others.

The issues on appeal focus on the amounts awarded to Plaintiff for past and future physical pain and mental anguish and for past and future physical impairment. Defendant does not contend that Plaintiff is entitled to no recovery for physical pain and mental anguish. Instead, Defendant challenges the awards by claiming that they are excessive and were the result of passion "stoked" by the trial court's erroneous evidentiary rulings. He does contend, however, that Plaintiff should not recover for physical impairment.

We affirm the awards of past and future physical pain and mental anguish because we see no clear indication that the jury's awards resulted from passion or an improper motive. Further, the limited attack that Defendant makes on the sufficiency of the evidence supporting the award for future physical pain and mental anguish also fails. We sustain the challenge to the award to compensate for past and future physical impairment because the evidence fails to establish a physical, rather than a psychological, cause for Plaintiff's loss of the enjoyment of certain aspects of his life. To remedy this deficiency, we suggest a remittitur of the damages awarded for physical impairment.

## II. Background

## A. The assault

The parties—apparently brought together only by fate—met in a Target parking lot. At the time of the incident, Plaintiff was a retired pharmacist in his sixties who was picking up a prescription; Defendant was a forty-three-year-old retired NFL defensive back who was grocery shopping. Because it was the flashpoint of the encounter, we note that Plaintiff is a white gentleman and that Defendant is a black gentleman.

The men passed within feet of each other in the parking lot. Their interaction as they reached each other, and the words exchanged are in dispute. But at least some of the comments involved race.

There is little dispute about the result of their interaction. Target's security camera recorded most of what happened. Also, a person who chanced to see the encounter while driving through the parking lot gave his description, which matches much of what the video depicts.

This person noticed Plaintiff and Defendant and then recounted that he "didn't really think much of [what he saw] until [Plaintiff] passed and was walking towards the store and noticed that [Defendant] was pursuing him, actually cut him off before he could enter the store and viciously attacked him with a punch to the face." This witness continued,

I was driving towards finding a parking spot and noticed that [Plaintiff] had moved across the street. [Defendant] approached him. He threw a punch, snapping [Plaintiff's] head back, knocking him to the ground, to which scurrying to the ground, he grabbed him and picked him up and was dragging him back across the entryway, where a car was traveling before they parked. He threw him to the ground and began a motion to where he was going to kick him.

Defendant did not dispute that he committed an assault as that term is defined by law. He admitted the assault while testifying, he pleaded guilty to a criminal charge of misdemeanor assault, and his counsel conceded that his conduct constituted an assault as defined in the charge submitted in this case. Defendant did not claim that Plaintiff ever touched him during the incident.

## B. The consequences

The jury heard only the live testimony of Plaintiff and his wife about the impact and consequences of the assault. Defendant's only challenge to that testimony came through limited cross-examination and through noting inconsistent statements in medical records offered by Plaintiff.

Plaintiff recounted that as the encounter began, he felt threatened by Defendant's behavior. He then recounted being punched, grabbed from behind, and choked. He thought during the assault that Defendant would kill him. Plaintiff summarized the consequences of the event on his life:

> That I can be in the parking lot of a Target on a nice, sunny day, and just be randomly attacked, premeditatedly, unprovoked; can be choked, viciously hit in the face, and just the results of it totally changing my life. It was like a redefining of my quality of life at that point from there on out.

4

The blow struck by Defendant opened a gash above Plaintiff's eye that required stitching. The jury saw the picture of Plaintiff's eye after the assault. The eye remained swollen shut for a week and looked "gross" for many more weeks. Plaintiff had problems with his balance that persisted for "awhile." He described how the most painful part of the event was the crushing of his throat and larynx, which produced a raspy voice for many weeks. He also described soreness and stiff muscles that he had experienced after the event. But he acknowledged that he had refused transport by ambulance after the event and that the physical injuries to his eye and throat resolved themselves within a month.

Later in his testimony, Plaintiff mentioned lingering physical problems, such as pain while swallowing, bruising, decreased ability to hear, a drooping eyelid, and additional sinus congestion. According to Plaintiff, he suffered physically from the assault as evidenced by an increase in the number of migraines he suffered—from one per month up to four or five per month after the assault. Defendant's cross-examination of Plaintiff focused on his failure to seek medical treatment for these complaints. Plaintiff also acknowledged that before the assault, he had suffered from migraines and had received treatment for allergy issues.

Additionally, Plaintiff recounted that he began to experience "stress-induced clenching of the teeth," which cracked and chipped his teeth, was extremely painful, and caused pain to radiate down his neck. This condition impaired his ability to chew and decreased his enjoyment of food that he had previously enjoyed. At the time of

5

trial, he wore an orthotic device to manage the symptoms. Defendant's counsel confronted Plaintiff on cross-examination with the fact that during his deposition, he did not mention grinding his teeth.

According to Plaintiff, the psychological effects of the assault were "more profound" than the physical ones:

> Psychologically, I mean, I have a fear of going out into the public. I prefer just to stay at home. I don't get out and socialize, go shopping much unless I have to. We haven't been on a vacation since the attack. We used to travel a lot. We traveled all over the world. Of course, [my wife] is from Taiwan. I haven't been back to see her parents for a number of years now.[1]

> I socialize in isolation, just being reclusive. When I go out, say we do go out to eat, which we do occasionally still, go out in public or something, I'm just hypervigilant. I'm constantly looking for threats, somebody that might attack me. And if I get in a closed area where there's a group of people, elevator or whatever, like in an elevator, I always go to the back, put my back up against the wall so nobody can sneak up behind me and kind of start reviewing all the people in the elevator, you know, which ones might be a threat. I get nervous, anxious, diaphoretic, which is sweating. My hands get cold and clammy. I tell myself, you know, this is irrational, it's crazy, these people aren't going to hurt me, but still it doesn't stop the anxiety.

Plaintiff's description of the effects that lingered after the event included intrusive thoughts of being beaten and difficulty sleeping. These thoughts impaired his ability to focus on tasks. He recounted a loss of interest in hobbies that he previously enjoyed and in sex. He also recounted the impact on his ability to interact

---

[1]The assault took place in January 2014, and the case was tried to a jury in September 2017.

with his family and strangers. But as with the treatment for his physical complaints, Plaintiff acknowledged that he had not seen a psychiatrist, a psychologist, or a therapist for treatment of his psychological issues.[2]

Plaintiff's wife described the anxiety Plaintiff experienced from going out in public, his embarrassment, and sleep troubles that did not exist before the event. Though Plaintiff told her that he would "get better," she had not seen him doing so.

## C. The jury's awards

After answering "yes" to the question regarding whether Defendant assaulted Plaintiff, the jury assessed the following damages:

- $400,000 for physical pain and mental anguish suffered in the past;

- $200,000 for physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future;

- $75,000 for physical impairment sustained in the past;

- $50,000 for physical impairment that, in reasonable probability, Plaintiff will sustain in the future; and

- $0 for both past and future disfigurement.

The jury failed to achieve the necessary consensus to answer whether Plaintiff's harm resulted from Defendant's malice.

---

[2]Though not argued to the jury, Defendant's brief points out statements in the medical records introduced by Plaintiff. Those records contain documents related to Plaintiff's annual physicals after the event and appear to discount the effects he described in his testimony.

7

### III. Construing Defendant's Issues on Appeal

Defendant's brief does not tell us whether he attacks the legal or factual sufficiency of the evidence underlying the damage awards. Defendant phrases his first issue as an attack on the award because it is "so excessive, on its face, as to shock the conscience" and his second as a claim that the award "was the result of passion, prejudice, or improper motive." A claim that damages are excessive is a factual-sufficiency complaint. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence."). We therefore construe both of Defendant's issues as attacks on the factual sufficiency supporting each of the damage awards: (1) past physical pain and mental anguish; (2) future physical pain and mental anguish; and (3) past and future physical impairment.

### IV. Standard of Review and the Factors We Examine to Determine Whether Factually-Sufficient Evidence Supports the Jury's Award

Generally, when reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

8

Factual-sufficiency review, in general, is highly deferential to the jury's findings and is one that gives appellate courts few specific guideposts to follow. Our path is even less certain when reviewing the factual sufficiency of nonpecuniary damages, such as physical pain, mental anguish, and physical impairment.

We begin with the principle that our evidentiary review must be "meaningful." *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017), *cert. denied*, 138 S. Ct. 1264 (2018). Though nonpecuniary damages are not subject to exact valuation and the jury is "given a measure of discretion in finding damages," its discretion is limited, and it "cannot simply pick a number and put it in the blank." *Id.* The jury "must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Id.* The supreme court's overview of this task is "[a]dmittedly, . . . simple but not simplistic: 'Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both.'" *Id.* (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)).

But a sampling of the principles that guide our meaningful review reinforces both the deference we must pay to the jury's assessment of the amount of damages and the vagueness of the principles that guide the review:

- "The presence or absence of pain, either physical or mental, is an inherently subjective question." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

9

- "The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.*

- "The amounts of damages awarded for pain and suffering . . . are necessarily speculative[,] and each case must be judged on its own facts." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

- "Once the existence of some . . . mental anguish . . . has been established, there is no objective way to measure the adequacy of the amount awarded as compensation." *Id.*

- "An award of future damages in a personal injury case is always speculative." *Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied).

We will coax what standards we can from the cases that review nonpecuniary damage awards.

This case went to the jury with charge questions that combined the award of physical pain and mental anguish. Thus, we assess the jury's damage award not only from the standpoint of mental anguish but also from the physical pain suffered by Plaintiff. *See Turner v. Duggin*, 532 S.W.3d 473, 484 (Tex. App.—Texarkana 2017, no pet.) ("Since the Turners lodged no objection to the lack of segregation in the jury charge of the mental anguish damages from the question pertaining to physical pain damages, we cannot now differentiate between the award of one kind of damage from the other."); *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 518 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (stating that plaintiff may recover for pain in the past and for pain that he or she may experience in the future).

10

The duration of the physical pain and mental anguish is an important consideration. *Sanchez v. Balderrama*, 546 S.W.3d 230, 238 (Tex. App.—El Paso 2017, no pet.). And whether the physical pain diminished over time is also a factor to consider. *Patino-Perez v. Howland*, No. 01-16-00054-CV, 2017 WL 3598241, at *5 (Tex. App.—Houston [1st Dist.] Aug. 22, 2017, no pet.) (mem. op.). But a jury can also infer that mental anguish suffered in the past is an indication that mental anguish will continue in the future. *Patel v. Hussain*, 485 S.W.3d 153, 182 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Also, evidence that a person was still able to maintain some positive aspects to his life does not negate the existence of mental anguish because mental anguish requires only a substantial—but not total—disruption of one's life. *Id.* at 183.

Though the concept is mostly relied on to establish the existence, rather than the amount, of compensation for physical pain and mental anguish, the supreme court has also evaluated the amount of an award based on how disturbing and shocking the underlying act is. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) ("[S]ome types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995))).

Further, although not a standard that weighs the evidence, appellate courts accord respect to a jury's award of nonpecuniary damages when the record demonstrates careful consideration of what amount to assess. A jury demonstrates

11

this level of care when it awards different claimants different amounts for different categories of nonpecuniary damages. *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 121–22 (Tex. App.—Eastland 2008, pet. denied) ("It is also evident that the jury did not simply pick numbers at random but gave careful consideration to this issue. We note that the jury distinguished between each of the plaintiffs."). *But cf. Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 577 (Tex. App.—Houston [14th Dist.] 2018) (stating that jury did not show that it had carefully considered its award when it "picked a final amount of $10,000,000 for each parent's damages, divided that total by the number of damage blanks in the jury charge, and then filled in the same amount of damages in each blank"), *supplemented*, No. 14-16-00036-CV, 2018 WL 2106599, at *1 (Tex. App.—Houston [14th Dist.] May 8, 2018, no pet. h.); *Lane v. Martinez*, 494 S.W.3d 339, 351 (Tex. App.—Eastland 2015, no pet.) ("[I]t appears that the jury in this case did not give careful consideration to each of the damage elements but, rather, picked a number at random and just filled in the blanks."). Here, we do not have awards to different claimants but can test whether the jury showed care in how it awarded damages in different categories.

In the search for a quantifiable standard to tether an analysis, courts may also look to awards in similar cases for guidance on whether the award under review is excessive. *Critical Path Res.*, 561 S.W.3d at 570; *Cotton Patch Café v. McCarty*, No. 02-05-00082-CV, 2006 WL 563307, at *6 (Tex. App.—Fort Worth Mar. 9, 2006, no pet.) (mem. op.) ("Even though each case must be judged on its own unique facts, it is

12

proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive."). This exercise seems counter to the principle that each award is a unique exercise of the jury's discretion. *See Primoris Energy Servs. Corp. v. Myers*, No. 01-16-00631-CV, 2018 WL 6542569, at *10 (Tex. App.—Houston [1st Dist.] Dec. 13, 2018, no pet.) (op. on reh'g) ("'Because the measure of damages in a personal injury case is not subject to precise mathematical calculation, each case must be measured by its own facts, and considerable latitude and discretion are vested in the jury.' . . . Therefore, comparison with other cases or amounts of verdicts is 'generally of little or no help.'" (quoting *U-Haul Int'l, Inc. v. Waldrip*, 322 S.W.3d 821, 855–56 (Tex. App.—Dallas 2010), *rev'd in part on other grounds*, 380 S.W.3d 118 (Tex. 2012))); *Critical Path Res.*, 561 S.W.3d at 570 (looking to awards in other cases may be useful in determining reasonable compensation but cannot be the sole basis for deciding the issue because "comparison of injuries in different cases is virtually impossible"). But we will compare cases dealing with assault and that have comparable claims of damage to the award in this case.

The effort to quantify the analysis also sometimes looks to the ratio of nonpecuniary damage awards to those for pecuniary losses. *See Bentley v. Bunton*, 94 S.W.3d 561, 607 (Tex. 2002) ("But all of this is no evidence that Bentley suffered mental anguish damages in the amount of $7 million, more than forty times the amount awarded him for damage to his reputation. The amount is not merely excessive and unreasonable; it is far beyond any figure the evidence can support.");

13

*Lane*, 494 S.W.3d at 351 ("This large ratio of non-pecuniary damages to pecuniary damages, coupled with the large amount of non-pecuniary damages awarded in this case when compared to other reported cases, and the apparent act of the jury of simply picking a number and putting it in the blanks lead us to the conclusion that the jury's awards of non-pecuniary damages [are] not supported by factually sufficient evidence."). Some courts use another variation of the ratio analysis and convert past awards into a per diem figure that is used as a figure to multiply times the plaintiff's life expectancy to determine future damages. *Turner*, 532 S.W.3d at 485–86.

Here, we do not have any pecuniary awards to use for a comparison and must rely more on factors such as the nature of the event that produced the physical pain and mental anguish. *See Aragon*, 268 S.W.3d at 121 ("This case does not have 'hard' damages such as lost wages or medical expenses to use as a benchmark. However, it is clear that mishandling the body of a family member can cause damage.").[3] Further, the fact that the amount of nonpecuniary damages far exceeds the amount of medical expenses incurred by a party does not signal a lack of factual support. *See PNS Stores*, 484 S.W.3d at 519 (holding that ratio of fifty-eight to one of medical expenses to nonpecuniary damages did not warrant new trial).

---

[3]This court recently questioned whether a ratio analysis applies when other evidence supports the award of nonpecuniary damages. *See Emerson Elec. Co. v. Johnson*, No. 02-16-00173-CV, 2018 WL 5074702, at *21 n.18 (Tex. App.—Fort Worth Oct. 18, 2018, no pet. h.) (mem. op.). We do not reach this question because we lack the data to perform a ratio analysis.

Courts also sometimes examine whether improper evidence or arguments took hold of the jury and whether the force of those arguments or evidence were given an impermissible sway in assessing nonpecuniary damages. *See Lane*, 494 S.W.3d at 351 ("Appellants contend that the jury 'was more likely than not influenced by' improper closing arguments and the trial court's evidentiary error. Appellants continue that, '[t]o that end, the record demonstrates that the jury's award of nonpecuniary damages . . . was more likely than not arrived at by some improper motive such as passion, prejudice or speculation.'" (footnote omitted)). Defendant in this case focuses most of his arguments on the contention that the damage awards show that passion, prejudice, or some other improper motive influenced the jury. We question whether this runaway-jury attack on damages retains much vitality. The supreme court has emphasized that the remedy for an excessive verdict is to order a remittitur, and remittitur is only available should we conclude a damage award rests on factually insufficient evidence. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 851 (Tex. 2000). In *Torrington*, the supreme court questioned its own holding that suggested passion and prejudice rather than factual sufficiency should be the proper standard to evaluate excessive damages. *Id.* Though we question the vitality of an analysis that focuses on a runaway jury, we will review Defendant's contentions that the jury in this case based its award on some factor other than the evidence.

Finally, the mere fact that a jury awarded more in damages than a party's counsel asked for in argument is not an indicator of an excessive award if the evidence

15

otherwise supports the amount of the award. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000) ("A jury may award more damages than requested by a party if there is evidence supporting the higher award of damages.").

We will review in turn the awards for past physical pain and mental anguish, future physical pain and mental anguish, and past and future physical impairment.

## V. We Affirm the Jury's Award of $400,000 for Physical Pain and Mental Anguish Sustained in the Past

With respect to the $400,000 award for past physical pain and mental anguish, our review does not focus on the factual sufficiency of the evidence. That approach is dictated by Defendant's failure to focus on the sufficiency of the evidence supporting the award. Instead, Defendant focuses on peripheral arguments that attempt to convince us that the trial court's evidentiary rulings deprived the jury of evidence needed to make its decision, heard matters that must have had a prejudicial effect on its determination of damages, or made an award far exceeding that made in similar cases. We are not persuaded that the jury abandoned its duty to assess reasonable compensation.

### A. The trial court's refusal to admit Plaintiff's medical bills

Initially, Defendant challenges the trial court's refusal to admit certain medical bills of Plaintiff. Defendant sought to introduce two sets of Plaintiff's medical bills. The first were the bills from a medical-care facility that he visited—both to treat the injuries he received in the incident and later to treat other medical matters—and the

16

second were the bills from an internal-medicine doctor of osteopathy that Plaintiff visited on several occasions for general medical treatment, which consisted mostly of checkups. The bills totaled slightly more than $1,000, and Defendant sought to admit the bills to show what Plaintiff had paid for the medical services he had received and that that these bills were necessary to complete the picture created by the admission of Plaintiff's medical bills the under the doctrine of optional completeness.

The trial court refused to admit the medical bills because Plaintiff did not seek a recovery of medical expenses. For this reason, the trial court concluded that the records were both not relevant and confusing to the jury because the jury would not answer any questions regarding the amount of medical expenses. Defendant argues that the medical bills should have been admitted because they supported a "reasonable inference that [Plaintiff's] injuries were relatively minor" and that "absent such records, [Defendant] had no means to question [Plaintiff's] self-serving testimony" regarding his injuries. The record undermines both contentions—admission of the bills would not have given the jury any more information than it already had to test the amount awarded as nonpecuniary damages. Further, the trial court's concern about the confusion that might be created by admission of the medical bills was valid. *See* Tex. R. Evid. 401, 403. Beyond this, Defendant never explains how exclusion of the medical bills fomented some passion in the jury that impacted its verdict.

17

The record demonstrates that even without the medical bills in evidence, Defendant had several means to support his contention that Plaintiff's injuries were minor and to question the description of the injuries. Through cross-examination, Defendant established that Plaintiff drove himself to the doctor after the incident, the medical services he received, and how long it took for the injuries to heal. Cross-examination also established that Plaintiff had never seen a psychiatrist, a psychologist, a mental-health professional, or a therapist and what medications he had been prescribed for his complaints. In a second round of cross-examination, Defendant again questioned Plaintiff about what medical treatment he sought for his complaints.

Further, a number of medical records were introduced that described the treatment Plaintiff had received after the incident and the nature of the medical services Plaintiff had received from the time of the incident to the time of the trial. In his closing argument, Defendant emphasized the themes developed on cross-examination—the short time that Plaintiff's injuries took to heal, the lack of mention in the medical records of certain complaints Plaintiff made at trial, and the fact that the jury had no evidence other than Plaintiff's word to establish many of his injuries. Thus, Defendant was able to develop and emphasize the theme of minor injuries and to challenge Plaintiff's description of his injuries without the medical bills being admitted into evidence.

18

The trial court's concern about the confusion that might be created by the admission of the medical bills was warranted. One of the arguments previously faced by the supreme court when it dealt with whether only recoverable medical expenses were admissible was that all evidence of medical expenses—whether recoverable or not—should be admissible as a benchmark to guide the jury in setting non-economic damages. *Haygood v. De Escabedo*, 356 S.W.3d 390, 398 (Tex. 2011). The supreme court rejected this argument by noting that nonrecoverable economic damages— damages that the jury could not award—were not relevant to get non-economic damages because their admission would be "substantially outweighed by the confusion it is likely to generate." *Id.* Here, the trial court expressed its concern that the jury would be confused because it would not be required to answer any charge question about medical expenses. The trial court's concern appears to be the same expressed in *Haygood*—a fear that the introduction of evidence on a matter that the jury would not be asked to decide would confuse the jury on how it should use that evidence in determining the awards it was asked to make.

Defendant also at least implies that he would have used the medical bills in a way that would have compounded the confusion. Presumably, Defendant would have used the amount of the medical bills as a benchmark to urge that the jury tie its determination of nonpecuniary damages to some calculated factoring in the amount of the medical bills. But the assessment of damages for physical pain and mental anguish can be based on many factors beyond those requiring medical treatment. *See,*

*e.g.*, *PNS Stores*, 484 S.W.3d at 519 (holding that trial court did not err by granting a new trial because of a disparity between the medical expenses that plaintiff incurred and the amount awarded for nonpecuniary damages).

## B. Defendant's argument that certain issues raised at trial prejudiced the jury against him

Defendant's next argument relies on the premise that the jury must have been swayed by some prejudice to award the amount of damages that it did. Defendant argues that three events allegedly prejudiced the jury—questions about whether Defendant appeared to be on drugs, questions about whether Defendant had been sued and had settled a prior civil suit, and hypothetical questions about how the encounter could have produced worse results. These arguments fail for three reasons: (1) the prejudicial effects of these events do not answer the question of whether the evidence is factually sufficient to support the jury's awards, (2) the runaway-jury attack is not a substitute for an analysis of factual sufficiency, and (3) the events lack the potential for prejudice that Defendant portrays them as having. We are not persuaded that the events Defendant describes had such an effect on the jury that it abandoned its duty of assessing fair and reasonable compensation.

As set forth above, an attack on the excessiveness of damages must demonstrate that the evidence is not factually sufficient to support the award. Defendant, however, does not analyze how the jury's $400,000 award for past physical pain and mental anguish is not supported by factually sufficient evidence. Thus, the

question becomes whether an attack predicated on the contention that the jury was "stoked" by prejudice can substitute for a factual-sufficiency analysis. As stated above, the supreme court's view is that the runaway-jury argument is not the proper method of analyzing excessiveness of damages. But to give Defendant's arguments a thorough review, we will address each of the arguments Defendant raises and state our reasoning why each specific event did not, in our view, divert the jury from assessing reasonable compensation.

### 1. The alleged prejudicial effect of questions about whether Defendant appeared to be on drugs when he assaulted Plaintiff

Defendant challenges the relevance of the questions asked of him regarding whether a witness thought he was on drugs when he assaulted Plaintiff. Further, Defendant claims that the questions asked of Plaintiff—regarding whether he thought Defendant was on drugs at the time of the incident—were highly prejudicial. But Plaintiff never stated an opinion that Defendant was on drugs; Plaintiff said that he thought Defendant might be crazy. Beyond this, Defendant never explains how the fact that he might have been on drugs was any more inflammatory than admittedly assaulting Plaintiff.

If Defendant feared the dire effect of this testimony on the jury, he did little to protect himself. The objection to the question posed about whether Plaintiff thought that Defendant was on drugs centered on disclosure during discovery and not on relevance. After an initial objection based on speculation, Plaintiff testified without

objection about the basis for his thinking that Defendant might be on drugs. *See Elete v. SEJ Props., LP*, No. 05-08-00445-CV, 2009 WL 2452942, at *2 (Tex. App.—Dallas Aug. 12, 2009) (mem. op.) ("By failing to object each time Shokrian testified SEJ owned the property, Elete waived this complaint."), *supplemented*, 2009 WL 3087256 (Tex. App.—Dallas Sept. 29, 2009, no pet.) (mem. op.). Defendant also claims the trial court should have excluded the evidence under Texas Rule of Evidence 403 but cites no record reference to an objection relying on that rule.

Further, no one testified that Defendant had used drugs before the assault; Defendant denied he was on drugs, and again, Plaintiff never stated a belief that Defendant was under the influence of drugs. Plaintiff confirmed that he was not claiming that Defendant was on drugs but said that possibility was on his mind because of Defendant's actions.

### 2. The alleged prejudicial effect of questions about whether Defendant had been sued before

This argument focuses on the effect on the jury's attitude of an allegation made against Defendant in a prior lawsuit. Recognizing that the trial court did the best it could with the situation it faced when the issue arose, Defendant focuses less on the fact that the issue was raised than on how many times it was asked. We have no means to gauge how repetition impacted the jury's determination of damages, especially in view of the absence of an analysis of the evidence supporting the award.

22

As impeachment, Plaintiff's counsel asked Defendant without objection about the truthfulness of his deposition testimony that he had never been a defendant in a civil suit. In response to Defendant's answer that he did not recall, Plaintiff's counsel asked if Defendant remembered his deposition answer that he had not been sued for assault, and again, he answered that he did not recall. Next, Plaintiff's counsel asked whether Defendant had been sued for a specific act of assault, and Defendant's counsel asked to approach the bench. In a long discussion out of the presence of the jury, the trial court stated its belief that because there had been no objection to the first two questions, the next question about a specific act was proper impeachment. Though the trial court permitted the question, the trial court made clear that it would not allow the case to evolve into satellite litigation about whether the specific assault occurred.

Defendant moved for a mistrial, and the trial court denied that request, noting that the questions that had been asked and the lack of objection to the questions put Defendant,

> in an unenviable position, but your client said he was not aware of the fact that he'd been sued for assault. Sued for assault. And his answer was, I don't recall, and there was no objection to that. I didn't see it coming because I don't know the facts of your case.

Because the question about a specific assault was still pending and because the status of the questioning was a proper question, the trial court permitted questions specifically directed to how Defendant had answered a deposition question about

23

prior litigation, if he thought that he would remember the allegation, and if he denied the allegation in the civil suit.

The careful trial court dealt as it thought best with the confusing situation it faced and ensured that Plaintiff's counsel had leeway to ask the questions the trial court felt the record permitted but also ensured that the allegations of a specific assault did not become the central focus of the trial. Defendant does not argue that the trial court erred by how it reconciled this confusion but instead argues that the question was asked too many times. In Defendant's words, "Although raising the fact that [Defendant] had been a defendant in a civil lawsuit before may have been appropriate for impeachment purposes, it was wholly unnecessary and highly prejudicial for [Plaintiff's] counsel to *repeatedly* mention the nature of the suit." As noted initially, we have no means to assess and no basis to believe that the repetition of a question prompted the jury to act based on passion rather than on the evidence.

### 3. The alleged prejudicial effect of Plaintiff's hypothetical questions

Defendant next argues that the jury was enflamed by questions on cross-examination about how the situation could have been worse. In Defendant's words, the questions "no doubt planted vivid, violent, and untrue ideas . . . about [Defendant's] behavior, resulting in undue prejudice." This argument never explains how the questions planted an impression more vivid and violent than Defendant's assault and Plaintiff's injuries or how the questions led the jury to accept untrue ideas when no one testified that the hypothetical events had occurred.

24

Defendant stated, "It's, you know, a bad situation that could be worse." Plaintiff's counsel pivoted off this comment and asked Defendant if it could have been worse had the blow he struck shattered Plaintiff's glasses and blinded him. The trial court overruled Defendant's counsel's objection that this question called for a "medical conclusion." Defendant responded that metal or glass objects forced into the body can cause damage. Here, there was no question that Plaintiff wore glasses, and a nonparty witness saw Defendant knock Plaintiff to the ground with a "vicious[] attack[]" administered through a punch that caused Plaintiff's head to "rip" back, knocking his glasses off. The jury saw pictures of the injury to Plaintiff's eye. We do not see how the questions asked created such a vivid impression on the jury that the mere asking of them diverted the jury from assessing reasonable compensation. The questions only noted a common-sense possibility that if Plaintiff's glasses had been knocked into his eye rather than off, his injuries could have been worse.

Next, Defendant argues that the jury was inflamed by the following question, "And if you're speeding through a parking lot at a hundred miles per hour, you could run over a person who is minding [his] own business, like a child, right?" In response to Plaintiff's speculation objection, the trial court ruled that Defendant could answer if he knew the answer. Defendant stated that he did not know his speed and that he "just wanted to remove [himself] from the situation." Again, the nonparty witness testified that Defendant exited the parking lot "at a very high rate of speed." The

surveillance video showed how Defendant exited the parking lot, giving the jury the ability to infer Defendant's rate of speed.

### 4. The issues raised by Defendant do not clearly indicate that passion, prejudice, or improper motive swayed the jury

Thus, we are asked to gauge the effect that the following had on the jury's assessment of damages:  (1) suggestions of drug use by Defendant that he denied and to which he raised no objection; (2) the repetition of what Defendant appears to concede was a proper question; and (3) hypothetical questions that appear to express a reasonable concern based on the acts of Defendant for which the jury could assess for itself whether the question contained hyperbole.

Here, Defendant references matters that portrayed him in a negative light but fails to show that these matters clearly indicate that the jury based its award on passion, prejudice, or some other improper motive.  *See Burry*, 203 S.W.3d at 552 (stating that one formulation of the factual sufficiency review is whether "the record clearly indicates that the award was based on passion, prejudice, or improper motive").  Further, as we noted, the supreme court emphasizes that our analysis should focus on whether the evidence supports the conclusion that the jury's award is reasonable compensation and not whether a runaway jury made the award.  And without any attack on the factual sufficiency of the evidence supporting the award of past physical pain and mental anguish, we have no gauge to measure a claim that the

award is excessive and thus nothing to prompt an initial concern that some improper influence drove the award.

### C. Comparison of the award in this case to awards by other juries

Not surprisingly, Defendant directs us to physical-pain-and-mental-anguish recoveries in assault cases that, for the most part, are much lower than the jury's award in this case. We have already noted our concern about comparing awards and whether this squares with the concept that each jury determines nonpecuniary damage awards by applying its discretion to the facts before it. Beyond this, it is unclear how to make the comparison. Are we to compare the events causing the physical pain and mental anguish or the nature of the physical pain and mental anguish experienced? How closely must the amount of the award under review hew to awards in other cases? We will look to other cases but only to the extent of asking whether the award in this case is so out of line with other awards that it meets one of the standards for granting a new trial because the award shocks the judicial conscience. *See Pool*, 715 S.W.2d at 635 ("[C]ourts of appeals, when reversing on insufficiency grounds, should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding . . . shocks the conscience . . . .").

Among others, Defendant cites us to an award in an assault case upheld by this court in 2005. *See Gibbins v. Berlin*, 162 S.W.3d 335 (Tex. App.—Fort Worth 2005, no pet.). In *Berlin*, one of the plaintiffs received a damage award of $100,000 for past physical pain and mental anguish and $250,000 for future physical pain and mental

27

anguish. *Id.* at 344. The injuries were more severe in *Berlin* than they are here, but the event was less traumatizing—a bar fight versus being attacked in a Target parking lot. *See id.* at 338. In addition, thirteen years of inflation have elapsed since *Berlin*. *See Tex. Constr. Co. of Austin v. Allen*, 635 S.W.2d 810, 812 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.) ("Even if the award seems to be high, both the jury and the appellate court are entitled to consider the effects of inflation and the decreasing value of the dollar."). We cannot say that the $600,000 award in this case shocks our conscience when compared to the fifteen-year-old award of $350,000 in *Berlin*.

Indeed, awards for physical pain and mental anguish have increased. In 2016, a court of appeals affirmed an award of $150,000 for past physical pain and mental anguish and of $520,000 for future physical pain and mental anguish. *See PNS Stores*, 484 S.W.3d at 517–18. In *PNS Stores*, the event—being hit in the head by a bottle of deck wash that fell from a shelf—was less traumatizing but the damages were arguably more severe than in this case.[4] *See id.* at 518.

_____

[4]*PNS Stores* described the physical pain and mental anguish as follows:

As discussed above, evidence was presented that, by the time of trial, Munguia has suffered physical pain in the form of, among other things, terrible headaches and ringing in his ears for over two and one-half years, severe pain in his right eye upon exposure to light, and soreness and stiffness in his neck and shoulder. That evidence is factually sufficient to support the jury's award without regard to mental anguish. Moreover, Munguia testified to past mental anguish in the form of fear and despair that, unlike his recovery from prior significant medical problems, he would not recover from this seemingly intractable problem. Munguia also testified that his personality has changed for the

28

In a recently decided case, a plaintiff was injured when he was knocked from his four-wheeler by a truck that was backing up, and a court of appeals upheld an award of $500,000 in future physical pain and $50,000 for future mental anguish that accompanied an award of $2 million for future physical impairment with an award of only $15,000 past physical pain. *See Primoris Energy Servs.*, 2018 WL 6542569, at *7–11. The future physical pain award stood in the face of the contention that the plaintiff "presented no evidence of future medical expenses, he did not complain about pain, and his doctor did not prescribe pain medication for him." *Id.* at *10.

Again, we do not claim that any of the cited cases are on all fours with this case. But they do establish that it is not unheard of for juries to give high-dollar awards for physical pain and mental anguish with impacts somewhat similar to those described by Plaintiff. To the extent that we can gain anything from the process of comparing the verdict in this case to others, the comparison does not reveal that the jury's verdict here was so outlandish that it shocks the conscience.

## D. Why we affirm the jury's award for past physical pain and mental anguish

As noted, Defendant does not explain in his briefing why the jury's award of past damages for physical pain and mental anguish lacks factual support. His attacks

---

worse; he sometimes becomes irritable, angry, and cries for no reason, and he is unable to shake off the negative feelings. Munguia's wife testified that Munguia is no longer upbeat and happy and "his heart is not in anything."

484 S.W.3d at 518.

are peripheral to this central question and take the form of attacks that passion or prejudice drove the jury's determinations. We have reviewed and rejected each of those contentions. Thus, we overrule Defendant's challenges to the amount of the award for past physical pain and mental anguish.

## VI. We Affirm the Jury's Award of $200,000 for Physical Pain and Mental Anguish That, in Reasonable Probability, Plaintiff Will Sustain in the Future.

We will not revisit the arguments that we have previously considered and rejected about the jury's motives in its award or the disproportion of the awards to those in other cases. We have also detailed the evidence of the physical pain and mental anguish that Plaintiff claimed. To challenge the award of damages for future physical pain and mental anguish, Defendant narrowly focuses on an argument that the evidence is factually insufficient. He argues that an award of one-half of the awards for past physical pain and mental anguish cannot be sustained in view of the fact that Plaintiff's physical injuries healed shortly after the event and that he never sought treatment for his "mental symptoms."[5] In view of the record before us, we

---

[5]Defendant's argument is as follows:

> Numerous Texas courts have noted that setting damages for physical pain and mental anguish is a difficult and largely subjective exercise. However, there is no reasonable interpretation of the facts presented under which the future physical pain and mental anguish allegedly suffered by [Plaintiff] is compensable at one half of his past damages for the same ($200,000 versus $400,000), when nearly all of his physical symptoms had resolved within a few weeks of his initial injuries, and his alleged continuing mental symptoms had never been sufficiently severe for him to seek the care of a therapist or counselor.

30

will defer to the jury's determination of what it decided was a reasonable award in this case.

Looking to the record and the factors that courts rely on to assess nonpecuniary damage awards, we will not second-guess the jury in this case for the following reasons:

- The jury had a benchmark of $400,000 in past damages as its starting point. The award of future damages in the amount of one-half of the amount awarded for past damages suggests the jury took into consideration at least of one of the factors cited by Defendant— Plaintiff's more acute injuries had resolved, and perhaps some of the lingering effects of the injury were lessening.

- The jury heard Plaintiff's testimony about the physical and mental consequences of the event. We do not reassess the jury's credibility determinations, which reflect that they believed Plaintiff.

- The shocking and traumatizing nature of the event could reasonably be expected to have lasting consequences.

- The jury could infer that because Plaintiff suffered anguish in the past, that anguish would to some degree continue.

- The jury's awards of different amounts for each category of damages shows how carefully the jury exercised its discretion to assess damages.

Thus, we overrule Defendant's challenges to the amount of the award for future physical pain and mental anguish.

**VII. We Conclude that the Evidence Does Not Support the Award for Past and Future Physical Impairment. We Suggest a Remittitur of the Amounts Awarded Plaintiff for Those Recoveries**.

In its last award, the jury assessed $75,000 for physical impairment that Plaintiff sustained in the past and $50,000 for physical impairment that he would in reasonable probability sustain in the future. The loss of the enjoyment of life that the jury apparently compensated Plaintiff for did not result from an impairment of his body and thus was not compensable under a theory of physical impairment. To remedy this deficiency in the proof, we suggest that Plaintiff remit the two amounts awarded as damages for physical impairment.

Texas courts are wary of recoveries for physical impairment because of the vague line of demarcation between damages for physical impairment and other categories of nonpecuniary damages. *See PNS Stores*, 484 S.W.3d at 515 ("We agree that caution is warranted and note that our review of the evidence addresses this concern because it requires the plaintiff to prove that he incurred 'injuries that are *distinct from, or extend beyond*, injuries compensable through other damage elements' and that these distinct injuries have had a substantial effect." (quoting *Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 402 (Tex. App.—Houston [14th Dist.] 2010, no pet.))). The role assigned to damages for physical impairment is to compensate for "loss of enjoyment of life, encompass[ing] the loss of the injured party's former lifestyle." *Id.* at 514; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) ("Indeed, if other elements such as pain, suffering, mental anguish, and disfigurement

are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life.").

The charge in this case was drafted to attempt to prevent the jury from giving overlapping damage awards and used terms that, though undefined, focused the impairment on a physical cause. Specifically, the charge in this case does not define physical impairment but does instruct the jury not to "compensate twice for the same loss." Without a definition of physical impairment in the charge, appellate courts look to the commonly understood meaning of the term physical impairment. *Barnhart v. Morales*, 459 S.W.3d 733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). *Barnhart* found this commonly understood meaning in the dictionary: "The Merriam-Webster Dictionary, New Edition defines physical as 'of or relating to the body.'" *Id.* (citing Merriam-Webster Dictionary 543 (2004 ed.)). The court noted that the same dictionary defines "impair" to mean "to diminish in quantity, value, excellence, or strength." *Id.*

We can amplify on what must be found to support recovery for physical impairment by looking to an oft-cited opinion of the Austin Court of Appeals that states both the criteria to establish what damages are compensable for physical impairment and gives examples of injuries meeting those criteria:

> To make these determinations, Texas courts have looked to whether (1) impediments to the plaintiff's non-work-related activities are obvious from the injury itself; or (2) the plaintiff produces some evidence of specific non-work related tasks or activities he can no longer perform. Examples of injuries or limitations that have been held to be legally

33

sufficient evidence of physical impairment include difficulty eating and communicating with others; continuing inability to sleep due to sharp pains, plus inability to run, bicycle, participate in triathlons, and play with children; past inability to walk and future difficulties in running, standing, and climbing; inability to ascend or descend stairs or kneel and difficulty in standing for long periods of time; loss of seventy-five percent of strength in left arm, which subsequently contributed to plaintiff's falling, breaking her leg, and being confined to a wheelchair; and difficulties performing yard work, car maintenance, and playing racquetball.

*Patlyek v. Brittain*, 149 S.W.3d 781, 787 (Tex. App.—Austin 2004, pet. denied) (op. on reh'g) (internal citations omitted). Thus, to state the matter in its most obvious way, physical impairment requires an impairment impacting a person's enjoyment of life, but that impairment must have a physical cause.

Certainly, Plaintiff testified that he experienced a loss of enjoyment of life—from a decreased interest in his hobbies to no longer traveling.[6] But the record does not support the conclusion that this loss resulted from an impairment of some

---

[6]Plaintiff catalogues the following aspects of life that he has lost the enjoyment of:

[Plaintiff] testified that since the assault he does not socialize with friends, does not go shopping as often, and has not been on a single vacation. Prior to the assault, [Plaintiff] and his wife travelled frequently all over the world. However, since the assault[,] he has not even gone back to see his wife's family in Taiwan. [Plaintiff] testified that the assault impacted his "day-to-day" life in numerous ways, including loss of interest in his hobbies like collecting Americana. [Plaintiff] blames the assault for an ongoing lack of motivation, lack of interest, and diminished sex drive. He visits with friends and family less often as a result of the assault. [Record references omitted.]

34

physical function that he had before the events at Target, and this failing undermines

his recovery for physical impairment.

Recognizing but not conceding the failing, Plaintiff argues around it with a

contention that the charge in this case allowed the jury to award damages for a loss of

enjoyment in life with both a physical and a psychological cause:

> Accordingly, whether the jury charge calls this category of damages "physical impairment" or "loss of quality of life," the effect is the same. There is no need to distinguish between impairment that is caused by physical limitations and impairment caused by mental or psychological limitations. In the case, [Plaintiff] presented abundant evidence of diminished enjoyment of life.

This argument equates physical impairment with any loss of enjoyment of life, which

is not correct because it fails to recognize that the loss must be traced to a physical

cause.[7] Nor, to the extent that Plaintiff makes the argument, does the phrasing of the

---

[7]Plaintiff did testify that after the assault, "I had a decreased range of motion, a lot of pain, discomfort. I couldn't do my normal activities." He also mentioned that grinding his teeth impaired his ability to chew and decreased his enjoyment of food that he once enjoyed. Though a loss of the ability to do "normal activities" and the effects of grinding his teeth might implicate a loss of enjoyment of life, Plaintiff did not draw that connection in this testimony. When he listed those aspects of his prior life that he could no longer enjoy, he attributed the cause of that loss of enjoyment to a psychological—not a physical—effect of the assault. Nor does the statement say that the inability to perform his normal activities actually caused him to enjoy life less. Thus, we give the statement no weight in assessing Plaintiff's entitlement to a recovery for physical impairment. Further, though we affirm the jury's awards of past and future physical pain and mental anguish, those awards were generous. The focus that Plaintiff placed on the cause of his loss of enjoyment of life and the amounts of the awards for physical pain and mental anguish warrant our concern that the awards for physical impairment overlap the generous awards for physical pain and mental anguish. Addressing that concern also underlays our order of remittitur.

charge support the argument. No matter the lack of a definition, the submitted question requires the jury to assess damages for a "physical" impairment. As noted above, this word specifies that the impairment must be related to the body and not to the mind. Thus, we agree that the evidence is factually insufficient to support an award of damages for physical impairment, either in the past or in the future, and we sustain Defendant's challenges to the award for past and future physical impairment.

Because Defendant challenges only the factual sufficiency and because Defendant's prayer requests only that we "set aside the jury's award of damages and either reduce the award to an amount not to exceed $50,000 . . . or remand this matter to the trial court for a new trial on the issue of damages only," we are prohibited from rendering judgment. *See generally Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 149–50 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("[W]hen there is evidence to support some damages[,] it is not appropriate to render judgment. . . . In that situation, we must remand for a new trial unless a remittitur would be appropriate."). Accordingly, to remedy the failing in the proof of physical impairment, we will exercise our power to suggest a remittitur of the award for past and future physical impairment. *See* Tex. R. App. P. 46.3.[8]

---

[8]As stated in *PNS Stores*,

> A court of appeals may exercise its power to suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d

## VIII.  Conclusion

Having overruled Defendant's challenges to the awards of physical pain and mental anguish, both in the past and in the future, we affirm the award of $400,000 for past physical pain and mental anguish and the award of $200,000 for future physical pain and mental anguish.  But having sustained Defendant's challenges to the award for past and future physical impairment, we reverse the award of $125,000 for past and future physical impairment.  We suggest a remittitur of $125,000 for the amount of the past and future physical impairment award.  If, within fifteen days of the date of this opinion, Plaintiff files in this court a remittitur of $125,000, then our subsequent judgment will reform the trial court's judgment in accordance with the remittitur and, as reformed, affirm that judgment.  *See* Tex. R. App. P. 46.3, 46.5. Unless a voluntary remittitur is timely filed, we will reverse the trial court's judgment and remand the case to the trial court for a new trial on the issue of unliquidated damages.

/s/ Dabney Bassel

Dabney Bassel
Justice

---

106, 124 (Tex. 2009); *see* Tex. R. App. P. 46.3.  "If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict.  The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded."  *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987).

484 S.W.3d at 513.

Delivered:  February 14, 2019